IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| In Re: Fifth Third Early Access Cash Advance Litigation | ) | CASE NO. 1:12-cv-00851-MRB |
| | ) | |
| | ) | DISTRICT JUDGE MICHAEL R. BARRETT |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | **PLAINTIFFS' OPPOSITION TO FIFTH THIRD'S MOTION TO DISMISS THE COMPLAINT** |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

s/ Stuart Scott
STUART E. SCOTT  (0064834)
DANIEL FRECH  (0082737)
**SPANGENBERG SHIBLEY & LIBER LLP**
1001 Lakeside Avenue East, Suite 1700
Cleveland, OH  44114
(216) 696-3232
(216) 696-3924 (FAX)
*sscott@spanglaw.com*
*dfrech@spanglaw.com*

***Counsel for Plaintiffs and the Proposed Class***

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................ 1

II.    STATEMENT OF FACTS .................................................................................. 4

   A.   Fifth Third's Early Access Program ............................................................ 4

   B.   Plaintiffs Allege That Fifth Third Grossly Misrepresents The APR It Charges For Its Early Access Loans .................................................................................................. 5

   C.   Plaintiffs Allege That Fifth Third Charges Usurious Rates For Its Early Access Loan ..... 6

III.   ARGUMENT ...................................................................................................... 6

   A.   Fifth Third Breached The Contract ............................................................. 6

      1.   The APR "Methodology" Disclosed By Fifth Third Does Not Void The Repeated 120% APR Disclosures Elsewhere In The Contract. ........................................... 7

Summary

Defendant repeatedly emphasizes the 120% APR promise in the Terms & Conditions for their Early Access loan product but then assesses finance charges well in excess of that amount. Because neither the bank's "methodology" nor their "example" of how that APR was calculated change that simple fact, Fifth Third breached the contract.

PrimaryAuthorities

*JNT Properties, L.L.C. v. Keybank National Association,* 134 Ohio St.3d 209 (2012)

      2.   At The Very Least, The APR "Methodology" Contradicts Repeated 120% APR Representations Throughout The Contract. ....................................................... 9

Summary

All terms in a contract must be given force if at all possible. The 120% APR representations must therefore be given force. To the extent the bank's "methodology" contradicts the 120% APR promised, the contract must be interpreted against the drafter and in favor of Plaintiffs.

PrimaryAuthorities

*Central Realty Co. v. Clutter*, 62 Ohio St.2d 411 (1980)
*Farmers' Nat. Bank v. Delaware Ins. Co*., 83 Ohio St.309 (1911)

*Graham v. Drydock Coal Co.*, 76 Ohio St.3d 311 (1996)

3.    The APR Disclosure Permitted Fifth Third To "Pay Itself Back" Only After One Month Had Passed. ............................................................................................................. 11

Summary

The "methodology" and "example" relied upon by the Defendants in defending their 120% APR representation necessarily imply that Early Access loans are made for a period of one month.  When the bank took their funds back sooner, they breached the Contract.

4.    Fifth Third Breached Its Promise To Provide An Accurate Point Of Comparison To Other Credit Products. ............................................................................................................. 11

Summary

Fifth Third affirmatively told customers to rely on the 120% APR in comparing Early Access to other credit products.  However, the 120% APR was not accurate and did not actually enable the Plaintiffs to make an accurate comparison.   By providing an inaccurate APR disclosure, Fifth Third breached the contract.

PrimaryAuthorities

CFPB, "Payday Loans and Deposit Advance Products—A White Paper of Initial Data Findings," April 24, 2013

B.   Fifth Third Violated Tila Whether The Loans Are Closed-Ended Or Open-Ended Credit 12

1.    TILA's Purpose. ....................................................................................................... 13

2.    Early Access Loans Carried Multiple APRs; Fifth Third Disclosed Only The Lowest Possible One....................................................................................................................... 13

Summary

It is central to the purpose of TILA that lenders provide reliable APRs such that consumers can fairly an accurately assess the cost associated with various forms of credit.  Fifth Third provided an inaccurate disclosure that did not reflect the variable nature of the APR associated with Early Access loans and thereby violated TILA.

<u>PrimaryAuthorities</u>

CFPB, "Payday Loans and Deposit Advance Products—A White Paper of Initial Data Findings," April 24, 2013
15 U.S.C. 1601 et seq. (TILA)
*Beach v. Ocwen Fed. Bank*, 523 U.S. 410 (1998)
*Pezza v. Wells Fargo Bank*, N.A., No. 09-2097, 2011 WL 3847248 (D.N.J. Aug. 30, 2011)

3.      Fifth Third Ignored The "Best Information Available" For Its APR Disclosure. ...... 14

<u>Summary</u>

TILA requires that where a lender does not have all information necessary to calculate the APR on a loan product, that it use the best information available. Fifth Third instead used the least accurate information available to calculate an estimated APR that was not labeled as an estimate. This violated TILA.

<u>PrimaryAuthorities</u>

12 C.F.R. 1026 et seq. (Regulation Z)

4.      TILA Requires Accurate APR Disclosures; Fifth Third's Were Not. ....................... 15

a.      Early Access Loans Are Closed-Ended Loans ...................................................... 15

<u>Summary</u>

Payday loans such as the Early Access program have been previously determined to be closed-ended credit. Early Access meets none of the statutory requirements in order to be considered open ended credit and the out-of-date OCC interpretation letter relied upon by Fifth Third is irrelevant and unpersuasive. Early Access loans are closed-ended credit.

<u>PrimaryAuthorities</u>

12 C.F.R. 1026 et seq. (Regulation Z)
15 U.S.C. 1602(i)
*In re Woods*, 69 B.R. 999 (Bankr. E.D. Pa. 1987)
*Johnson v. Ventra Group, Inc.*, 191 F.3d 732 (6th Cir.1999)

b.      Fifth Third Failed To Provide Proper Closed-Ended Loan Disclosures ................ 20

Summary

> As closed-ended credit, Early Access loans are required to disclose their APR and other terms *before* the credit is extended.  Where the term is unknown, the lender is to use a good faith best estimate for each loan.  The bank did not do so and violated TILA.

PrimaryAuthorities

> 12 C.F.R. 1026 et seq. (Regulation Z)

5.      The APR Disclosure Is Inaccurate Even If Early Access Loans Are Open-Ended.... 21

    a.      Open-End Creditors Must Disclose An Accurate Periodic Rate ........................... 22

Summary

> Fifth Third failed to disclose a periodic rate as required of lenders offering open-ended credit products because, of course, the Early Access program does not have a periodic rate (because it is not an open-ended credit product).

PrimaryAuthorities

> 12 C.F.R. 1026 et seq. (Regulation Z)

    b.      Open-End APR Disclosure Must Be Calculated According To TILA .................. 23

Summary

> Fifth Third did not use a periodic rate to calculate the APR it disclosed as TILA requires for lenders offering open-ended credit products.

PrimaryAuthorities

> 12 C.F.R. 1026 et seq. (Regulation Z)

    c.      A "Periodic Rate" Must Be Applied To An Outstanding Balance ........................ 23

Summary

> Fifth Third failed to adequately explain how and when the "periodic balance" to which the finance charge would be was determined.  Further, they treated all loans as though they were repaid in 30 days regardless of when they took the funds for the customer's account.  Fifth Third thereby violated TILA.

<u>PrimaryAuthorities</u>

12 C.F.R. 1026 et seq. (Regulation Z)

d.     TILA Requires Accurate APR Disclosure On Periodic Statements ...................... 24

<u>Summary</u>

Fifth Third reiterated the inaccurate 120% APR on customer's bank statements even after they were aware that a loan had an actual APR significantly higher.  This also violated TILA.

<u>PrimaryAuthorities</u>

12 C.F.R. 1026 et seq. (Regulation Z)

C.   Fifth Third Violated EFTA ............................................................................... 25

<u>Summary</u>

The plain language of Fifth Third's contract conditioned the extension of credit to the Plaintiffs on their agreeing to preauthorize electronic funds transfers at substantially regular intervals, in direct violation of the EFTA.

<u>PrimaryAuthorities</u>

15A U.S.C. 1693 (EFTA)
*Mitchem v. GFG Loan Co.*, 99 C 1866, 2000 WL 294119 (N.D. Ill. Mar. 17, 2000)
*O'Donovan v. Cashcall, Inc.*, No. 08-3174 MEJ, 2009 WL 1833990 (N.D. Cal. June 24, 2009)
*Okocha v. HSBC Bank USA, N.A.*, No. 08-8650, 2010 WL 5122614 (S.D.N.Y. Dec. 14, 2010)

D.   The Choice Of Law Provision Does Not Bar Plaintiffs' Non-Ohio State Law Claims.... 28

<u>Summary</u>

The choice of law provision in the Contract does not bar Plaintiffs' non-Ohio consumer protection claims because the provision is not appropriately applied tort claims or statutory claims in substantially the same form.

PrimaryAuthorities

    *Banek, Inc. v. Yogurt Ventures U.S.A.*, 6 F.3d 357 (6th Cir. Mich. 1993)
    *Inacom Corp. v. Sears, Roebuck and Co.*, 254 F.3d 683 (8th Cir. 2001)
    *Morrison v. YTB International, Inc.*, 649 F.3d 533 (7th Cir. 2011)

E.   Plaintiffs State Valid Claims Under The Kentucky And Illinois Consumer Protection Laws ................................................................................................................... 30

  1.    Illinois Consumer Fraud Act. ................................................................ 31

Summary

Plaintiff's claim under the Illinois Consumer Fraud Act is not merely a restated breach of contract claim – it involves allegations of fraud and deceptive trade practices.  Further, because Fifth Third's illegal activity is a matter of public interest, the claim is cognizable regardless.

PrimaryAuthorities

    Illinois Consumer Fraud Act, 815 ILCS 505/1 to 515/12
    *Petri v. Gatlin*, 997 F.Supp. 956 (N.D. Ill. 1997)

  2.    Kentucky Consumer Protection Act. ........................................................ 33

Summary

Plaintiff's claim under the Kentucky Consumer Protection Act is viable because it involves unfair, false or misleading acts and because the bank's actions were unconscionable within the meaning of Kentucky law.

PrimaryAuthorities

    Kentucky Consumer Protection Act , KRS 367.120
    *Capitol Cadillac Olds, Inc. v. Roberts*, 813 S.W.2d 287 (Ky. 1991)

F.   Plaintiffs Have Adequately Alleged An Ohio Fraud In The Inducment Claim ............... 35

Summary

The documents that form the contract were also those provided to the plaintiffs as information prior to their choosing to utilize the Early Access program and were used to

defraud the Plaintiffs into entering into the contract. Further, the existence of a contract is not a bar to a fraud in the inducement action where the contract itself contained fraudulent terms.

<u>PrimaryAuthorities</u>

*ITS Fin., LLC v. Advent Fin. Services, LLC*, 823 F.Supp.2d 772 (S.D. Ohio 2011)
*Res. Title Agency, Inc. v. Morreale Real Estate Services*, Inc., 314 F.Supp.2d 763 (N.D. Ohio 2004)

G.  Plaintiffs Have Adequately Alleged A Claim For Conversion........................................ 37

<u>Summary</u>

Plaintiffs have properly alleged a claim for conversion of specifically identifiable funds which were sequestered by their source or use.

<u>PrimaryAuthorities</u>

*In re Checking Account Overdraft Litigation*, 694 F.Supp.2d 1302 (S.D. Fla. 2010)

H.  Plaintiffs Have Adequately Alleged A Claim For Unjust Enrichment............................ 38

<u>Summary</u>

Ohio law allows claims of breach of contract and unjust enrichment to be plead in the alternative at this stage of the litigation

<u>PrimaryAuthorities</u>

*Firelands Reg'l Med. Ctr. V. Jeavons*, 2008-Ohio-5031 (6th Dist.)

I.  The Voluntary Payment Doctrine Has No Application Here ........................................... 38

<u>Summary</u>

Because the Plaintiffs did not pay the excessive finance charges voluntarily and because a cognizable fraud has been alleged, the voluntary payment doctrine has no application here.

<u>PrimaryAuthorities</u>

*Wears Kahn McMenamy & Co. v. JPMorgan Chase Bank, N.A*., 2:12-CV-812, 2013 WL 1689030 (S.D. Ohio Apr. 18, 2013)

J.    Plaintiffs' DIDA Usury Claim Is Not Barred By The Most Favored Lender Doctrine.... 40

<u>Summary</u>

Because the most favored lender doctrine only allows state chartered banks to charge the highest interest rate allowable to anyone in the state for the same class or type of loan, *Begala* is not relevant here.  No lender in Ohio can charge an APR over more than 28% on loans of this type.

<u>PrimaryAuthorities</u>

12 C.F.R. 7.4001
Northway Lanes, 464 F.2d at 862 (6th Cir. 1972)

K.    Cash Advance Fees Are Included In Ohio Revised Code 1109.20 ................................. 42

<u>Summary</u>

The Defendant's claim that the fee associated with the Early Access program is not interest contradicts the language of 1109.20 and strains simple logic, which would suggest that no loan – especially not one for which the bank disclosed an APR – is issued free of interest.

<u>PrimaryAuthorities</u>

12 U.S.C. 1831d (DIDA)
O.R.C. 1109.20

IV.  CONCLUSION.............................................................................................................. 45

# TABLE OF AUTHORITIES

## Cases

*A.R. Fuhlbrigge, M.D., Inc. v. Midwest Med. Consortium, Inc.*, 1993 WL 452068 (Ohio Ct. App. 6d 1993) ............................................................................................................ 36

*Banek, Inc. v. Yogurt Ventures U.S.A.*, 6 F.3d 357 (6th Cir. Mich. 1993) .................................. 29

*Beach v. Ocwen Fed. Bank*, 523 U.S. 410 (1998) ....................................................................... 13

*Begala v. PNC Bank, Ohio, N.A.*, 214 F.3d 776 (6th Cir. 2000) ................................................. 42

*Brown v. Payday Check Advance, Inc.*, 202 F.3d 987 (7th Cir. 2000) ....................................... 16

*Capital City Community Urban Redevelopment Corp. v. City of Columbus*, 2009-Ohio-6835 (10th Dist. Franklin Cnty.) ...................................................................................................... 10

*Capitol Cadillac Olds, Inc. v. Roberts*, 813 S.W.2d 287 (Ky. 1991) ................................... 33, 34

*Cent. Realty Co. v. Clutter*, 62 Ohio St.2d 411 (1980) .............................................................. 11

*Central Diversey M.R.I. Center, Inc.*, 952 F.Supp. 575 (1996) ................................................. 32

*Central Realty Co. v. Clutter*, 62 Ohio St.2d 411 (1980) .......................................................... 10

*Cheers Sports Bar & Grill v. Direct TV, Inc.*, 563 F.Supp.2d 812 (N.D. Ohio 2008) ............... 38

*CIC Group, Inc. v. Mitchell*, 2013 WL 774175, *4-5 (N.D. Ohio Feb. 27, 2013) ...................... 29

*Craig & Bishop, Inc. v. Piles*, 247 S.W.3d 897 (Ky. 2008) ...................................................... 35

*Davis v. Flexman*, 109 F.Supp.2d 776 (S.D.Ohio 1999) ........................................................... 37

*Exchange Nat'l Bank*, 108 Ill. App. 3d 212 (Ill. App. Ct. 3d Dist. 1982) .................................. 32

*Farmers' Nat. Bank v. Delaware Ins. Co.*, 83 Ohio St.309 (1911) ........................................... 10

*Feathers v. State Farm Fire and Casualty Co.*, 667 S.W.2d 693 (Ky. App. 1983) .................... 34

*Firelands Reg'l Med. Ctr. v. Jeavons*, 2008 Ohio 5031 (6th Dist.) ........................................... 38

*First Bank E. v. Bobeldyk*, 391 N.W.2d 17 (Minn. Ct. App. 1986) ............................................ 41

*Franklin v. CitiMortgage, Inc.*, 1:11-CV-608, 2012 WL 10192 (S.D. Ohio Jan. 3, 2012) ......... 39

*FTC v. US Sales Corp.*, 785 F. Supp. 2d 737 (N.D. Ill. 1992) .................................................... 31

*George v. Auto. Club of S. Calif.*, 135 Cal. Rptr. 3d 480 (Cal. Ct. App. 2011) ......................... 34

*Gilkey v. Central Clearing Co.*, 202 F.R.D. 515 (E.D. Mich. 2001) ......................................... 16

*Golembiewski v. Hallberg Ins. Agency*, 635 N.E.2d 452 (Ill. App. 1994) ................................. 32

*Graham v. Drydock Coal Co.*, 76 Ohio St.3d 311 (1996) .......................................................... 11

*Greenwood Trust Co. v. Massachusetts*, 971 F.2d 818 (1st Cir.1992) ....................................... 44

*Harman v. Sullivan Univ. Sys.*, 2005 WL 1353752 (W.D. Ky. June 6, 2005) ............................ 34

*Hawthorne v. Umpqua*, 2012 WL 1458194 (N.D. Cal. Apr. 26, 2012) ...................................... 37

*Hrnyak v. Mid-West Nat'l Life Ins. Co.*, 2009 WL 735851 (N.D. Ohio Mar. 20, 2009) ........ 36, 38

*Hughes v. Ester C Co.*, 930 F. Supp. 2d 439 (E.D.N.Y. Mar. 15, 2013) .................................... 31

*Hughes v. TD Bank, N.A*, 856 F.Supp.2d 673 (D.N.J. 2012) ..................................................... 38

*Iacono v. Anderson Concrete Corp.*, 42 Ohio St.2d 88 ............................................................. 36

*In re Checking Account Overdraft Litigation*, 694 F.Supp.2d 1302 (S.D. Fla. 2010) ................ 37

*In re Cox*, 114 B.R. 165, 168 (Bankr. C.D. Ill. 1990) ............................................................... 13

x

*In re Nair,* B2 75-1636, 1978 WL 43321 (Bankr. S.D. Ohio Apr. 17, 1978)............................... 18

*In re Woods*, 66 B.R. 984 (Bankr. E.D. Pa. 1986) ........................................................................ 16

*In re Woods*, 69 B.R. 999 (Bankr. E.D. Pa. 1987) ........................................................................ 16

*Inacom Corp. v. Sears, Roebuck and Co.*, 254 F.3d 683 (8th Cir. 2001) ...................................... 29

*Integrated Molding Concepts, Inc. v. Stopol Auctions*, 2007 WL 3001385 (N.D. Ohio 2007).... 35

*ITS Fin., LLC v. Advent Fin. Services, LLC,* 823 F.Supp.2d 772 (S.D. Ohio 2011) .................... 36

*Jackson v. Am. Loan Co*., 202 F.3d 911 (7th Cir. 2000)................................................................. 16

*JNT Properties, L.L.C. v. Keybank National Association*, 134 Ohio St.3d 209 (2012) ................. 8

*Johnson v. Ventra Group, Inc.*, 191 F.3d 732 (6th Cir.1999) ........................................................ 29

*Kenty v. Bank One, N.A.*, 92 F.3d 384 (6th Cir. 1996) .................................................................. 42

*Levin v. Nielsen*, (8th Dist. 1973) 37 Ohio App.2d 29.................................................................. 36

*Long v. Fid. Water Sys., Inc.*, C-97-20118 RMW, 2000 WL 760328 (N.D. Cal. Mar. 16, 2000) 15

*Long*, No. 00 C 5842, 2001 U.S. Dist. LEXIS 24135 (N.D. Ill. Jan. 4, 2001) ............................ 32

*Magellan Real Estate Investment Trust v. Losch*, 109 F. Supp. 2d 1144 (D. Ariz. 2000)........... 29

*Mitchem v. GFG Loan Co*., 99 C 1866, 2000 WL 294119 (N.D. Ill. Mar. 17, 2000) .................. 27

*Mize v. Joe's Auto Sales, Inc.,* No. 04CV0597-DFH-VSS, 2005 WL 280343 (S.D. Ind. Jan. 26, 2005) ......................................................................................................................................... 13

*Morrison v. YTB International, Inc*., 649 F.3d 533 (7th Cir. 2011) .............................................. 28

*Nelson v. Am. Power & Light*, 2:08-CV-549, 2010 WL 3219498 (S.D. Ohio Aug. 12, 2010) .... 39

*Nelson v. Citibank* (South Dakota), N.A., 794 F.Supp. 312 (D.Minn.1992)................................ 43

*Nilsson v. NBD Bank*, 313 Ill. App. 3d 751 (Ill. App. Ct. 1st Dist. 1999)................................... 32

*Northway Lanes*, 464 F.2d at 862 (6th Cir. 1972) ........................................................................ 41

*O'Donovan v. Cashcall, Inc.*, No. 08-3174 MEJ, 2009 WL 1833990 (N.D. Cal. June 24, 2009) 26

*Okocha v. HSBC Bank USA, N.A.*, No. 08-8650, 2010 WL 5122614 (S.D.N.Y. Dec. 14, 2010) 27

*Pappas v. Pella Corp.*, 363 Ill. App. 3d 795 (2006) ..................................................................... 32

*Petri v. Gatlin*, 997 F.Supp. 956 (N.D. Ill. 1997) ........................................................................ 32

*Pezza v. Wells Fargo Bank, N.A.*, No. 09-2097, 2011 WL 3847248 (D.N.J. Aug. 30, 2011)...... 13

*Pokorny v. Pecsok*, 50 Ohio St.2d 260 (1977)............................................................................... 10

*Puglisi v. Debt Recovery Solutions, LLC*, 822 F. Supp. 2d 218 (E.D.N.Y. 2011)....................... 27

*Ramirez v. Smart Corp.*, 371 Ill. App. 3d 797 (3d Dist. 2007)..................................................... 33

*Regal Cinemas, Inc. v. W & M Properties*, 90 F. App'x 824 (6th Cir. 2004) ............................. 37

*Res. Title Agency, Inc. v. Morreale Real Estate Services, Inc.*, 314 F.Supp.2d 763 (N.D. Ohio 2004) ................................................................................................................................ 35, 36

*Resource Title Agency*, 314 F.Supp.2d at 772 ............................................................................. 38

*Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403 (2002).................................................. 33

*Rumford v. Countrywide Funding Corp.*, 678 N.E.2d 369 (Ill. App. 1997)................................. 32

*Salling v. Budget Rent-A-Car Sys., Inc.*, 672 F.3d 442 (6th Cir. 2012)........................................ 39

*Salvagne v. Fairfield Ford, Inc.*, 794 F.Supp.2d 826 (S.D. Ohio 2010)....................................... 13

*Scott v. Fairbanks Capital Corp.*, 284 F.Supp.2d 880 (S.D. Ohio 2003)..................................... 39

*Sharkey v. NAC Mktg. Co., LLC*, 12 C 4354, 2012 WL 5967409 (N.D. Ill. Nov. 28, 2012) ....... 27

xi

*Smith v. Check-N-Go, Inc.*, 200 F.3d 511 (7th Cir. 1999) ............................................................ 16

*Sparks v. Re/Max Allstar Realty, Inc.*, 55 S.W.3d 343 (Ky. Ct. App. 2000) ............................... 34

*State ex rel. Dickman v. Defenbacher*, 151 Ohio St.391 (1949) .............................................. 38, 39

*Tikkanen v. Citibank (S. Dakota) N.A.*, 801 F. Supp. 270 (D. Minn. 1992) ................................. 41

*U.S. ex rel. v. Boeing Co.*, 184 F.R.D. 107 (S.D. Ohio 1998) .................................................... 36

*Watson v. First Union Nat'l Bank*, 837 F.Supp. 146 (D.S.C. 1993) ............................................ 43

*Wears Kahn McMenamy & Co. v. JPMorgan Chase Bank, N.A.*, 2:12-CV-812, 2013 WL
     1689030 (S.D. Ohio Apr. 18, 2013)....................................................................................... 39

*Wells v. Craig & Landreth Cars, Inc.*, 474 Fed. Appx. 445 (6th Cir. Ky. 2012) ........................ 34

*Williams v. Gerber Products Co.*, 552 F.3d 934 (9th Cir. 2008)................................................. 31

*Yarnall v. Four Aces Emporium, Inc. (In re Boganski)*, 322 B.R. 422 (Bankruptcy App. Panel for
     the 9th Cir. 2005) .................................................................................................................. 16

## Statutes

12 C.F.R. 1005 et seq. ................................................................................................................... 4

12 C.F.R. § 1026 et seq. (Regulation Z) ............................................................................... passim

12 C.F.R. § Part 226, Supplement I, Section 226.2(a)(20) ......................................................... 20

12 C.F.R. § 7.4001 ....................................................................................................................... 40

12 U.S.C. § 1831d (DIDA) ........................................................................................................... 28

15 U.S.C. § 1601 et seq. (TILA)........................................................................................... passim

15 U.S.C. § 1602(i) ...................................................................................................................... 16

15 U.S.C. § 1693 (EFTA) ............................................................................................................ 25

Civ.R. 8(E)(2) ............................................................................................................................... 38

Kentucky Consumer Protection Act , KRS 367.120....................................................... 33, 34, 35

O.R.C. 1151.29-1151.2911 ........................................................................................................... 41

O.R.C. § 1161 ........................................................................................................................ 41, 42

O.R.C. § 1151 ............................................................................................................................... 41

O.R.C. § 1151.21 .......................................................................................................................... 40

O.R.C. § 1161.28 .......................................................................................................................... 40

OAG No. 3113 (1962) ................................................................................................................... 41

OAG No. 65-31 (1965) .................................................................................................................. 41

Plaintiffs, Lyn Adanich, Donald Adanich, Janet Fyock, Brian Harrison, Diana Horn, William Klopfenstein, Lori Laskaris, Daniel Laskaris and Adam McKinney (collectively, "Plaintiffs") respectfully submit this opposition to Fifth Third Bank's ("Fifth Third") Motion to Dismiss.

## I.     INTRODUCTION

In requesting dismissal of these consolidated cases, Fifth Third repeatedly points out that it told consumers its Early Access loans cost $10 per $100 borrowed, and that this "transaction fee" itself did not change based on the loan repayment date.  But that is not the subject of this action, which instead concerns inaccurate and misleading APR disclosures.  Plaintiffs allege the 120% APR disclosed for Early Access loans was accurate *only* for the tiny minority of loans outstanding for a full 30 days.  But Fifth Third withdrew Plaintiffs' repayments from their accounts after only a few days or weeks, leading to astronomically higher APRs than disclosed. An *accurately* disclosed transaction fee says nothing about these *inaccurately* disclosed APRs. That is why, for example, the Consumer Financial Protection Bureau ("CFPB") has opined that one simply cannot calculate an APR on "deposit advance" products like Early Access loans without taking into account the time the loan is outstanding:  a "[transaction] fee cannot be used to calculate an APR for the advance at the time the credit is extended."  CFPB, "Payday Loans and Deposit Advance Products—A White Paper of Initial Data Findings," April 24, 2013 ("CFPB White Paper," attached as Ex. 1), at 11.

With respect to the false APR disclosure Fifth Third contrived, the bank expressly told its customers that it was providing the APR representation to allow consumers to "compare the cost of using this product against other forms of credit."  Doc. 72-2 at 3.  Fifth Third then proceeded to provide an inaccurate and misleading APR for comparison, telling consumers that its payday loan carried a 120% APR, always, no matter how long the loan was outstanding.  According to

Fifth Third, that static APR representation was technically accurate—notwithstanding the impossibility of providing a one-size-fits-all APR—because it was disclaimed deep in the Contract by a "methodology" that supposedly informed consumers how the APR calculation was performed.  But that means, on Fifth Third's argument, that it could have told its customers that the APR for its payday loans was *anything at all* (50% or 20% or 1%), as long it provided a "methodology" showing how it arrived at that arbitrary number.  This argument is illogical and without merit.  The 120% APR misrepresentation Fifth Third made was false and deceptive, and it made Early Access loans look more attractive, relative to other credit products, than they actually were.

Moreover, the APR "methodology"—on which Fifth Third's entire argument that 120% APR for all loans is "accurate" hinges—does not even do what Fifth Third claims it does.  The verbal formula it provided was "[t]he **Annual Percentage Rate** is calculated by dividing the transaction fee by the Advance amount and multiplying the quotient by the number of statement cycles in a year."[1]  But that "methodology" does not apply to all Early Access loans; it only applies to loans whose terms happen to correspond to Fifth Third's statement cycle.  The methodology is silent with respect to Plaintiffs' days-long Early Access loans; when the "methodology" makes an *assumption* of a month-long loan term, it cannot speak to loans with shorter terms.

Plaintiffs' allegations of deception are not novel or new.  Indeed, the CFPB (the agency with regulatory authority over Fifth Third) has the same view as Plaintiffs regarding "deposit advance" products like Early Access loans.  According to the CFPB, because a "repayment date is not set at the time of the advance and will vary depending on timing and amount of electronic deposits…the [transaction] fee cannot be used to calculate an APR for the advance at the time

---

[1] Doc. 68, Consolidated Class Action Amended Complaint ("CAC"), at 4 (emphasis in original).

the credit is extended." CFPB White Paper, at 11. Of course, that is exactly what Fifth Third improperly does—calculate an APR based only on a transaction fee, regardless of varying repayment time, and contrary to CFPB's warning that "*each advance will have a different duration (measured as the number of days until repayment) and, therefore, a different APR*." *Id.* at 27. Ultimately, the CFPB concluded that these "findings [] raise substantial consumer protection concerns." *Id.* at 44. After intense pressure from regulators, shareholders, and affected consumers, Fifth Third just last week announced its intention to cease offering Early Access loans.

Plaintiffs' claims are largely based on the fundamentally unfair, inaccurate, and unchanging 120% APR misrepresentation. Their breach of contract claims stem from a plain reading of the Contract: Fifth Third disclosed a 120% APR for all Early Access loans, then charged a higher APR on most; it promised to provide an accurate comparison to other credit products, then provided an false comparison; its APR "methodology" has no bearing or applicability for loans that do not coincide with a 30-day billing cycle.

Fifth Third's misrepresentations are in plain violation of the requirements of the Truth in Lending Act ("TILA").[2] The entire purpose of TILA is to allow for an accurate comparison of credit. Fifth Third provided a misleading APR comparison, and it violated TILA whether Early Access loans are considered "closed-ended" or "open-ended" credit.

Plaintiffs' common law and consumer protection claims are not barred by the Ohio choice of law provision, since that provision exclusively bars claims regarding interest charges— and Fifth Third claims there is no interest on Early Access loans. Moreover, Plaintiffs' consumer protection claims can be, and are in part, premised on Fifth Third's TILA violations. But they are also premised on representations and practices independent of those TILA

---

[2] 15 U.S.C. 1601 *et seq.*, and Regulation Z, 12 C.F.R. § 1026 *et seq.*

violations.  And because the claims are not based exclusively on a Contract breach, they are not barred by the Illinois or Kentucky consumer protection statutes.

Further, Plaintiffs' federal usury claim, incorporating Ohio usury law, is not barred by the "most favored lender" doctrine, because no other Ohio banks are "more favored" with respect to the specific type of payday loan at issue in this case.  Finally, the Plaintiffs' Electronic Funds Transfer Act ("EFTA")[3] claim is based on Fifth Third's own Early Access agreement, which states that Early Access loans are conditioned on the automated, electronic repayment of loans from customers' checking accounts.  That is, a consumer could not get a loan if he or she did not first agree to electronic repayment.  Fifth Third's arguments all concern what happened *after* that initial agreement, but those facts are irrelevant to the EFTA analysis on whether credit is *conditioned* on electronic repayment.

## II.    STATEMENT OF FACTS

### A.    Fifth Third's Early Access Program

Fifth Third is one of a tiny number of mainstream financial institutions to offer short-term, closed-ended payday loans to its checking account customers.  Doc. 68, Consolidated Class Action Amended Complaint ("CAC") at ¶ 4.  Fifth Third refers to this program as "Early Access."  Doc. 68-1, Early Access Summary of Key Features and Terms & Conditions ("Terms & Conditions") at p. 1.  Fifth Third offers Early Access loans to customers residing in Ohio, Kentucky, Michigan, Illinois, Indiana, Tennessee, Missouri, and Florida.  CAC at ¶ 26.

What distinguishes Fifth Third's Early Access loans from those made by storefront payday lenders is the direct and automatic access Fifth Third has to its customers' checking accounts for repayment of Early Access loans.  CAC at ¶ 5.  The loan is contingent on the customers agreeing that Fifth Third repays itself the loan amount, plus interest, directly from a

---

[3] 15 U.S.C. 1693 *et seq.*; 12 C.F.R. § 1005 *et seq.*

customer's Fifth Third account.  *Id.*  If direct deposits are not sufficient to repay the loan within thirty-five (35) days, Fifth Third repays itself anyway, even if it overdraws the customer's account and generates a substantial overdraft fee.  *Id*. at ¶ 6.

### B.  Plaintiffs Allege That Fifth Third Grossly Misrepresents The Apr It Charges For Its Early Access Loans

Fifth Third prominently represents an Annual Percentage Rate ("APR") of 120% for every Early Access loan in the Terms & Conditions and in customers' checking account statements.  CAC at ¶ 7.  Plaintiffs reasonably relied on the representations and entered into the loan agreements.  *Id.* at ¶¶ 224, 227, 235, 238, 246, 249, 257, and 260.  In both the Terms & Conditions and on monthly bank statements provided to customers, Fifth Third states that the APR for Early Access loans is, in all cases, 120%.  *Id.* at ¶ 29.  The Terms & Conditions state plainly: "The transaction fee is $1 for every $10 borrowed.  This equates to an Annual Percentage Rate (APR) of 120% (emphasis added)."  *Id.*  The Terms & Conditions also state in bold print:

| Interest Rate | |
| --- | --- |
| **Annual Percentage Rate (APR) for Cash Advances** | **120%** |

Doc. 68-1 at 4.

In fact, Early Access loans carry a 120% APR only when repaid in 30 days.  *Id.* at ¶ 8.  The vast majority of Early Access loans carry an APR far higher than 120%–including Early Access loans with APRs of 500%, 1,000%, 1,800% or more.  *Id.* at ¶¶ 8 and 9.  But the bank discloses none of this to its customers.  *Id*. at ¶ 9.  In fact, nowhere in the Terms & Conditions did Fifth Third disclose to its customers that the APR for Early Access loans would be in excess of the represented 120% APR if the loan was repaid in less than 30 days.  *Id.* at ¶ 39.  The

Complaint details the APR interest charges paid by Plaintiffs for Fifth Third Early Access loans, which were well in excess of the 120% disclosed by Fifth Third and were even as high as 3,650%.  *See* CAC at ¶ 56(a)-(b), ¶ 62(a)-(h), ¶ 66, ¶ 72(a)-(f),¶ 78(a)-(f), ¶ 84(a)-(f), ¶ 90(a)-(e). The bank statements reflecting these transactions also falsely stated that the APRs were 120%. *Id.* at ¶¶ 56, 62, 72, 78, 84, and 90.

### C.  Plaintiffs Allege That Fifth Third Charges Usurious Rates For Its Early Access Loan

As set forth in detail in the Complaint, the vast majority of Early Access loans carry an APR far higher than 120%–including Early Access loans with APRs of 500%, 1,000%, 1,800% or more.  *Id*. at ¶¶ 8 and 9.  The APR that Fifth Third charges on Early Access loans, whether 120% or 1,800%, is far in excess of the interest rate allowed by federal and state law.  *Id*. at ¶ 12.

## III.  ARGUMENT

### A.  Fifth Third Breached The Contract

By stating a 120% APR repeatedly, Fifth Third's Contract tried to make a complex credit product appear simple.  *See* CFPB White Paper at 44 ("[o]n their face, these products may appear simple," but "the fact that deposit advances do not have a repayment date but rather are repaid as soon as qualified deposits are received adds a layer of complexity to that product which consumers may not effectively grasp.") (emphasis added).  But that attempt at simplicity fails because one simply cannot calculate an APR on "deposit advance" products like Early Access loans without taking into account the *time* the loan is outstanding.  CFPB White Paper, at 28 (APR of 304% given a 12-day duration deposit advance transaction).  That is precisely what Fifth Third tried to do: calculate an unchanging APR based on a $10/$100 transaction fee.  Fifth

Third's repeated emphasis, throughout its Motion, on its "accurate" disclosure of the transaction fee only continues this folly.

Fifth Third could have truthfully explained that the APR varies depending on repayment times. In that way, the Contract would have reflected the complexity of the product that the CFPB noted. Fifth Third did not choose that path. Instead, it drafted a Contract that twists itself in circles trying to turn the *transaction fee* into a timelessly fixed *APR*. As discussed below, however, the Contract fails to execute this neat trick.

### 1. The APR "Methodology" Disclosed By Fifth Third Does Not Void The Repeated 120% APR Disclosures Elsewhere In The Contract.

Fifth Third argues there was no breach because (a) it told customers of the $10 per $100 borrowed transaction fee; and (b) the "methodology" for calculating the APR was accurately and fully explained. Doc. 72-1, at 10. Neither argument insulates Fifth Third from Plaintiffs' breach of contract claims.

First, Fifth Third cannot deny that it represented a 120% APR for its Early Access loans. It attempts to redirect the Court by pointing out that the transaction fee ($10/$100 borrowed) is explained in various places of the Contract. Those representations do not help Fifth Third because a mere recitation of the transaction fee says nothing about the resulting APR, which is the promise that Plaintiffs allege Fifth Third breached.

With respect to Fifth Third's argument that the APR "methodology" is a salve for an otherwise misleading APR disclosure, the bank argues that "[t]he contract defines 'APR,' *and shows that it is based on a 12-month payment cycle*." Doc. 72-1, at 11 (emphasis added). But the Contract never "shows" this. The Contract's "methodology"—which is mentioned but once in the Terms & Conditions, compared to two bold-print 120% APR disclosures—does not even apply to all Early Access loans; it only applies to loans whose terms happen to correspond to

7

Fifth Third's statement cycle. The methodology, "[t]he **Annual Percentage Rate** is calculated by dividing the transaction fee by the Advance amount and multiplying the quotient by the number of statement cycles in a year,"[4] is silent with respect to Plaintiffs' Early Access loans, which were made for days, not a full statement cycle. When the "methodology" makes an *assumption* of a month-long loan term, it loses its ability to speak to loans (like Plaintiffs') with shorter terms.

Unlike in *JNT Property*, discussed *infra*, where an interest rate equation could be used by consumers to figure out an actual, customized APR for a borrower's individual loan—the methodology in the Early Access Contract cannot be used to calculate an accurate APR for the vast majority of loans. As such, it does not qualify or vitiate the 120% APR representations.

Fifth Third next points to an adjacent "example" in the Contract for support that all loans are calculated with a 30-day loan period. That "example" says: "For example, $100 advance with a $10 transaction fee = $10/$100 = 0.1% x 12 cycles = **120% APR.**"[5] First, the "example" has an obvious error: "0.1%" times "12 cycles" equals a 1.2% APR, not 120%. Even putting aside that less-than-diligent drafting, the "example" in no way fixes a 30-day loan term for each and every Early Access loan ever made. Indeed, on its very face it only claims to be only an "example," not a rule for each and every Early Access loan. It is a mere "example" of a particular Early Access loan, wherein the loan was made for 30 days, which corresponds to 12 "cycles" in a year. There is no basis to claim this "example" contractually controls each and every loan, particularly those made for less than 30 days (which are the only loans that are the subject of this lawsuit). An "example" of one Early Access loan cannot become a rule for all Early Access loans, as Fifth Third argues.

---

[4] CAC, at 4 (emphasis in original).
[5] The FAQs, also referenced by Fifth Third, also include this "example."

Compare this to the holding in *JNT Properties, L.L.C. v. Keybank National Association*, 134 Ohio St.3d 209, 2012-Ohio-5369 (2012), in which Fifth Third claims the Ohio Supreme Court "reject[ed] a similar attempt to rewrite a lender's contract with its borrowers." Doc. 72-1, at 21. The case does not support that assertion. *JNT* dealt with the application of the 365/360-day year to the disclosed interest rate in a commercial loan agreement, which had the effect of increasing the interest rate disclosed by .01389 annually. The loan agreement explained this to the borrower, albeit in a way that added an extra step to the processes of calculating an APR for the loan. The methodology provided by Fifth Third in the Early Access agreement does not provide *any* means for the borrower to calculate their true interest rate—nor does it attempt to explain that the rate it is providing is inaccurate as applied to most all loans. *JNT* therefore has no application.

Further, the 365/360-day method is the most common method of calculating interest on a commercial loan, it was disclosed as the method of calculation to be applied in the *JNT* loan agreement, and the plaintiffs in *JNT* were commercial borrowers. That means both that TILA and its mandatory requirements for how interest rates must be disclosed did not apply and that the borrowers were sophisticated business entities—not individuals trying to make it through until their next paycheck. In the immediate instance, where APR has a necessary and statutorily defined meaning and purpose and the bank's contract must be interpreted in favor of the consumers.

### 2. At The Very Least, The APR "Methodology" Contradicts Repeated 120% APR Representations Throughout The Contract.

In the Terms & Conditions alone, Fifth Third made two other, bold print, 120% APR representations—with no qualifiers, no methodologies, and no examples. (One of those was on the very first page of the Terms & Conditions.) Those disclosures essentially make the following

promise to every potential borrower: "your particular Early Access loan will carry an APR of 120%." Fifth Third argues those promises should not be taken seriously, since they were supposedly disclaimed by a small-print APR "methodology" buried deep in the Contract (as discussed above). Even if that were true (it is not), it would simply set up a contractual conflict between the unqualified 120% APR representation and the "methodology." And in the case of a conflict, a contract is read against the drafting party, Fifth Third. *Central Realty Co. v. Clutter*, 62 Ohio St.2d 411, 413 (1980) (a general rule of contract interpretation is that any ambiguous language should be interpreted against the party who drafted the contract).

It has long been the law in Ohio that "[i]n the construction of a contract courts should give effect, if possible, to every provision therein contained, and if one construction of a doubtful condition written in a contract would make that condition meaningless, and it is possible to give it another construction that would give it meaning and purpose, then the latter construction must obtain." *Farmers' Nat. Bank v. Delaware Ins. Co*., 83 Ohio St.309 (1911) (paragraph six of syllabus). *See also Pokorny v. Pecsok,* 50 Ohio St.2d 260, 268 (1977) (quoting Restatement (Second) of Contracts § 203 (1981)); *Capital City Community Urban Redevelopment Corp. v. City of Columbus*, 2009-Ohio-6835, at ¶ 30 (10th Dist. Franklin Cnty.) ("When interpreting a contract, we will presume that words are used for a specific purpose and will avoid interpretations that render portions meaningless or unnecessary.").

In other words, Ohio law requires that the 120% APR promise *must* be given meaning. So, at bare minimum, it is in conflict with the later provisions that attempt to wholly disclaim that promise and, in such circumstances, the benefit of the conflict goes to Plaintiffs, not Fifth Third, which drafted the Contract.[8]

---

[8] That is especially true because the language was part of an adhesion contract (CAC, ¶ 36), which under Ohio law must be strictly construed against the drafter, Fifth Third. *Graham v. Drydock Coal Co.,* 1996-Ohio-393, 76 Ohio

### 3. The APR Disclosure Permitted Fifth Third To "Pay Itself Back" Only After One Month Had Passed.

Even if Fifth Third is right that the "example" and "methodology" apply to every loan (it does not), and indicate that every loan's APR will be calculated as if it were outstanding for 30 days, that comes with a necessary implication: each loan has a term of 30 days. The "example" states: "For example, $100 advance with a $10 transaction fee = $10/$100 = 0.1% X 12 cycles = 120% APR." Putting aside the math error, this formula necessarily contains a representation as to the length of the loan—it assumes that the loan term is a billing cycle, or a month; the APR only equals 120% if that assumption is made. But the Bank did not loan the money for one month. Therefore, Fifth Third breached a promise to lend money for a full 30 days.

The only information in the Terms & Conditions that provides a loan term is the APR "methodology," and the *only* way to square that with the three representations concerning loan repayment is to conclude that loan repayment occurs after one month. If the loan term were not for one month, the 120% APR representation and APR "methodology" would necessarily be false. In short, it cannot be true that a loan is for less than 30 days *and* that the loan carries a 120% APR. Fifth Third breached the Contract either way.

### 4. Fifth Third Breached Its Promise To Provide An Accurate Point Of Comparison To Other Credit Products.

Fifth Third breaches the Contract in yet another way. According to the FAQs, the APR is disclosed so that "customers can compare the cost of using this product against other forms of credit." Doc. 72-2, at 3. But Fifth Third's APR disclosure does not allow the customer to compare the cost of credit associated with the program to that of other credit products as

---

St.3d 311, 313-14, 667 N.E.2d 949, 952 ("[A] contract is to be construed against the party who drew it.") (citing *Cent. Realty Co. v. Clutter*, 62 Ohio St.2d 411 (1980).

promised.  Fifth Third's interpretation of APR dramatically understates the cost of borrowing on an annualized basis, and it defeats the very purpose for which the Contract says it provided an APR.  Because the APR is based on a 30-day loan term and the loans were seldom if ever made for 30 days, it is useless to employ that "APR" for the sake of an accurate comparison with other credit products.  In other words, "the fix is in."

One cannot calculate a meaningful APR for a credit product without either knowing the term of the loan or having a periodic rate a lender will apply to any outstanding balance at set intervals of time.  These loans have neither.  As discussed above, the CFPB has determined that one simply cannot calculate an APR on "deposit advance" products like Early Access loans without taking into account the time the loan is outstanding.  White Paper, at 11 ("Unlike a payday loan…the repayment date is not set at the time of the advance and will vary depending on timing and amount of electronic deposits.  Hence the fee cannot be used to calculate an APR for the advance at the time the credit is extended.).

The Early Access loans do not have a set loan term, or a period rate that a lender applies uniformly to all balances at the end of a month.  What they have, instead, is a supposedly fixed APR that is actually anything but.  That makes a mockery of the idea of credit cost comparison.  When Fifth Third presented this inaccurate APR to compare the cost of its credit with other products in the market, it breached its own contractual promise.

**B.**    **Fifth Third Violated Tila Whether The Loans Are Closed-Ended Or Open-Ended Credit**

Fifth Third argues that Plaintiffs' TILA claims fail because they are "based on the false premise that Early Access is a closed-ended credit plan."  Doc. 72-1, at 27.  But Plaintiffs' claims are not based on that premise.  Even if Early Access loans are open-ended credit (they are

not), the Fifth Third's APR disclosures would violate TILA's clear command for accurate, common-sense, fair APR disclosures.

1.      **TILA's Purpose.**

TILA was enacted "to assure a meaningful disclosure of credit terms" and "to protect the consumer against inaccurate and unfair credit . . . practices." 15 U.S.C. § 1601(a). TILA requires creditors to disclose clearly and accurately all the material terms of a credit transaction so consumers can compare the cost of credit across products. *Beach v. Ocwen Fed. Bank,* 523 U.S. 410, 412 (1998). The disclosure of an APR is central to the uniform credit cost disclosure envisioned by TILA. Reg. Z, 12 C.F.R. § 1026.22 (describing calculation of APR).[10] The finance charge and APR, more than any other disclosures, enable consumers to understand the cost of the credit and to comparison shop for credit. *Id.*; *Salvagne v. Fairfield Ford, Inc*., 794 F.Supp.2d 826, 830 (S.D. Ohio 2010) (disclosures not meaningful if consumer cannot use disclosures to compare cost of credit among different products).

2.      **Early Access Loans Carried Multiple APRs; Fifth Third Disclosed Only The Lowest Possible One.**

TILA disclosures should be intelligible to an ordinary consumer, judged by an objective standard. *Pezza v. Wells Fargo Bank, N.A*., No. 09-2097, 2011 WL 3847248 (D.N.J. Aug. 30, 2011); *Mize v. Joe's Auto Sales, Inc.*, No. 04CV0597-DFH-VSS, 2005 WL 280343 (S.D. Ind. Jan. 26, 2005). Above all, disclosures must be accurate. *In re Cox* 114 B.R. 165, 168 (Bankr. C.D. Ill. 1990) (meaningful disclosure cannot be one which is inaccurate). Fifth Third failed to meet this basic TILA standard. It told consumers Early Access loans were a simple product with a simple APR, but that was false. Early Access is a complex program with many different APRs.

---

[10] In 2012, the CFPB republished Regulation Z, renumbering provisions at 1026. Prior to 2012, identical provisions were numbered at 226. Plaintiffs use the current citation, but note that identical provisions may be referred to in case law or other sources using their former numbering.

*See* CFPB White Paper at 44 ("the fact that deposit advances do not have a repayment date but rather are repaid as soon as qualified deposits are received adds a layer of complexity to that product which consumers may not effectively grasp.").  Facially, a disclosure of <u>one</u> APR when <u>multiple</u> APRs are possible violated TILA's requirement of accuracy.

There was literally nothing stopping Fifth Third from making this clear to consumers, either via a "sliding scale" showing the variation of APR with different loan terms, or via an express disclaimer that APR would necessarily increase if (as was likely) funds were recaptured prior to 30 days.  Because it was not fully forthright with consumers, this Court can find Fifth Third violated TILA without even considering TILA's other provisions.

### 3. Fifth Third Ignored The "Best Information Available" For Its APR Disclosure.

Plaintiffs allege that Fifth Third knew full well that the vast majority of Early Access loans would be repaid prior to 30 days.  CAC, at ¶¶ 8-9, 33, and 40.  But it did not draft disclosures that reflected this reality.  Even if Fifth Third could argue that it could not know, with precision, when any given Early Access loan would be repaid, TILA requires a lender to base all disclosures on the "best information reasonably available." According to Regulation Z, § 1026.17, General Disclosure Requirements:

> If any information necessary for an accurate disclosure is unknown to the creditor, the creditor *shall make the disclosure based on the best information reasonably available* at the time the disclosure is provided to the consumer, and shall *state clearly that the disclosure is an estimate*.

*Id.*, (c)(2)(i) (emphasis added).  Even if an Early Access loan repayment date is such an item of information, and assuming Fifth Third could not project the repayment date for an Early Access loan, and assuming it could not or would not provide a sliding scale or multiple-repayment-point APR disclosure, at the very least Fifth Third could have "estimated" the APR of an Early Access

loan. *See* Reg. Z § 1026.22. TILA requires that "estimate" to be based on the *best information available*, and even then to expressly state that the APR was nothing more than an estimate. Instead, Fifth Third used the least accurate estimate (which assumes that the customer did not have any direct deposits for at least 30 days) and failed to tell the Plaintiffs that it was using an estimate. This forms the basis for another TILA violation.

### 4. TILA Requires Accurate APR Disclosures; Fifth Third's Were Not.

Required TILA APR disclosures vary depending on whether a loan is open-ended or closed-ended. As discussed below, Plaintiffs' Early Access loans are a form of closed-ended credit, and Fifth Third failed to provide adequate closed-ended credit disclosures.

#### a. *Early Access Loans Are Closed-Ended Loans*

Lenders have an incentive to mischaracterize credit as "open-ended" because in certain respects the required disclosures for open-ended credit are not as robust as those for closed-end credit. Despite Fifth Third's attempt to label them "open-ended," however, Early Access loans are a form of closed-ended credit. Fifth Third's characterization of the loans is not determinative and the issue represents a fact question that cannot be resolved at this early stage of the litigation. *Long v. Fid. Water Sys., Inc.*, C-97-20118 RMW, 2000 WL 760328, at *4 (N.D. Cal. Mar. 16, 2000) (denying summary judgment, holding reasonable jury could disagree as to elements necessary for credit to be "open-ended," "likely preclud[ing resolution of] this question as a matter of law").

A close reading of TILA confirms Early Access loans are closed-ended. First, payday loans, which are functionally equivalent to Early Access loans, are treated as closed-ended credit under TILA. CFPB's official commentary defines payday loans as "transaction[s] in which a cash advance is made to a consumer in exchange for…the consumer's authorization to debit the

consumer's deposit account, and where the parties agree…that the consumer's deposit account will not be debited, until a designated future date." Reg. Z, Supp. I, § 226.2(a)(14). That commentary describes Early Access loans precisely as well. Early Access loans are a form of payday lending, and they are therefore closed-ended credit.[11]

Next, under TILA, to be considered open-ended credit, a credit device must meet **<u>all</u>** of the following conditions:

1) Reasonably contemplates repeated transactions;

2) Imposes a finance charge computed from time to time on an outstanding unpaid balance; and

3) Provides a replenishable credit line that is reusable without further approvals.

15 U.S.C. § 1602(i); Reg. Z, 12 C.F.R. § 1026.2(a)(20); Reg. Z, Official Commentary 1026.2(a)(20); *In re Woods*, 66 B.R. 984, 986 (Bankr. E.D. Pa. 1986) *on recons. in part*, 69 B.R. 999 (Bankr. E.D. Pa. 1987). Fifth Third's Early Access loans, on their face, do not comply with requirements (1), (2), or (3).

<u>First</u>, there are no "repeated transactions." Fifth Third could not reasonably expect "repeated transactions" for these high-cost loans. Indeed, Fifth Third told consumers that Early Access loans were "an extremely expensive form of credit" designed only for "appropriate emergencies [like] a car repair, medical care for you or your family, or travel expenses in connection with your job"—in short, emergency events that are not likely to recur with regularity. Moreover, whether Fifth Third reasonably contemplated repeated "emergency" transactions like this is at least a fact issue that cannot be resolved on a motion to dismiss. As

---

[11] A sampling of the cases that hold that payday loans are closed-end are: *Jackson v. Am. Loan Co.*, 202 F.3d 911 (7th Cir. 2000); *Brown v. Payday Check Advance, Inc.*, 202 F.3d 987 (7th Cir. 2000); *Smith v. Check-N-Go, Inc.*, 200 F.3d 511 (7th Cir. 1999); *Yarnall v. Four Aces Emporium, Inc. (In re Boganski)*, 322 B.R. 422 (Bankruptcy App. Panel for the 9th Cir. 2005); *Gilkey v. Central Clearing Co.*, 202 F.R.D. 515 (E.D. Mich. 2001).

the CFPB official commentary to TILA says explicitly, "the criterion regarding repeated transactions is a question of fact[.]" Reg. Z, Official Interpretations, § 1026.2(a)(20)-3.

Second, Early Access loans feature no finance charge "computed from *time to time* on an outstanding unpaid balance" (emphasis added); rather, the finance charge is computed *one time* only, at the time of issuance. Fifth Third charges a flat, up-front finance charge. Regulation Z is clear that if a finance charge is pre-computed at the inception of the transaction, it should not be considered an open-end transaction. Official Interpretations, Reg. Z, § 10226.2(a)(20)-4 (a finance charge is only computed "from time to time" when "there is no specific amount financed for the plan.").

Moreover, Fifth Third itself claims there is no "interest" on Early Access loans that could be "computed." It says expressly in the Frequently Asked Questions that: "We show the [APR] for Fifth Third Early Access so our customers can compare the cost of using this product against other forms of credit, *but there is no interest charge associated with an Advance*." Doc. 72-2, at 3 (emphasis added). Moreover, the transaction fee is only charged once per advance. *Id.*, 5-7. "Once" is not "time to time." In sum, Early Access loans are wholly different from open-ended credit like credit cards, where interest is applied to unpaid balances after the debt is incurred.

Third, there is no replenishable credit line that is reusable without further approvals. New Early Access loans are totally conditional on Fifth Third's approval; continued access to Early Access loan is not granted without review. The Terms & Conditions state that "[y]ou will only be eligible to take an Advance…if you meet the following eligibility criteria," then lists four separate criteria. The Terms & Conditions also specifies that "continuing eligibility" will be "restricted" if any of 12 events occur. In short, there is a specific approval and eligibility review for each Early Access loan. That conditionality disqualifies it from being considered "open-

ended" credit.   Reg. Z., Official Interpretations, § 1026.2(a)(20)-5 ("The creditor may occasionally or routinely verify credit information such as the consumer's continued income and employment status or information for security purposes *but, to meet the definition of open-end credit, such verification of credit information may not be done as a condition of granting a consumer's request for a particular advance…This criterion of unlimited credit distinguishes open-end credit from a series of advances made pursuant to a closed-end credit loan commitment*.") (emphasis added).  Fifth Third does far more than the routine demographic and credit-worthiness checking-up contemplated by TILA.  For example, Fifth Third's refuses a request for an Early Access loan if direct deposits stop for any reason—even if a borrower is still depositing monies to the account by other means, and even if a borrower has repaid all prior advances in full and on time.  Doc. 68-1 at 3.

This sort of conditionality keeps credit from being considered open-ended.  At least one court in this District has held precisely this.  *See In re Nair*, B2 75-1636, 1978 WL 43321 (Bankr. S.D. Ohio Apr. 17, 1978) (while the credit device "had been self-described as an 'open-end' revolving plan by [a credit union], the conditions imposed upon the granting of additional extensions of credit under the plan disqualified it from being considered an open-end plan" and comparing the credit device in that case to "credit cards, ready reserve accounts, and other similar type arrangements where, in effect, the extension of credit occurs without formal application and generally without the creditor's knowledge until after the event.  This simply was not the structure of the…plan and the mere labeling of the plan as an 'open-end credit' plan, while perhaps beneficial from a promotional point of view, does not serve to cause the plan to fall within the open-end credit provisions of the Truth In Lending laws.").

Fifth Third's argument that its Early Access loans are *not* closed-ended relies almost

wholly on a 13-year-old letter issued by the Office of the Comptroller of the Currency ("the OCC Letter"). First, that letter was not controlling authority when it was issued, and it certainly is not now. Second, that loan program analyzed in the OCC Letter appears to have significant differences from the Early Access program.

The OCC Letter is an interpretation of TILA. OCC did not at the time of the letter, nor does it now, have interpretative authority over TILA: the Federal Reserve Board had such authority over TILA in 2001, when the OCC drafted the letter, and the CFPB has that authority now. As such, the OCC's 13-year-old interpretation was entitled to little or no deference at the time it was drafted. It is entitled to less deference now, when the CFPB is in charge of interpreting TILA, and has already indicated its view that "deposit advance" products like Early Access loans are closed-ended. *See* CFPB White Paper, at 28 (APR of 304% given a 12-day duration deposit advance transaction). Such an APR is only possible if it is calculated in the closed-ended manner Plaintiffs claim, based on the actual time a loan is outstanding.[13] The CFPB clearly does not agree with Fifth Third's reading of TILA.

Moreover, the loan program analyzed in the 2001 OCC Letter appears to have significant differences from the Early Access program here. Because the bank requesting the OCC's advice did not "appear to question whether the Bank's program satisfies the [repeated transaction and replenishable credit factors from TILA]," the OCC did not seriously question those premises. OCC Letter, at 1. But those premises are hotly disputed in the instant litigation. Plaintiffs argue neither condition is met.

In reaching its determination, the OCC explicitly ignored an official staff interpretation from the very agency entrusted with interpreting TILA: the Federal Reserve Board. *See* OCC

---

[13] *See* CFPB White Paper at 28; *see also* Letter of Jan 2, 2013 from Senators Richard Blumenthal, Richard J. Durbin, Charles E. Schumer, Sherrod Brown and Tom Udall to the OCC, FDIC and Federal Reserve, at 1, indicating that these programs have annual interest rates averaging 365% APR, attached as Ex. 2.

Letter at 2 (disregarding official interpretation at 12 C.F.R. § Part 226, Supplement I, Section 226.2(a)(20) that a finance charge is only computed "from time to time" when "there is no specific amount financed for the plan.").  An OCC official's interpretation that ignores an official staff interpretation should be given little weight.  In any event, with respect to the Early Access loans at issue in this litigation, it is clear that there is a "specific amount" financed for each loan. That factor cannot argue in favor of "open-ended" credit as it did in the OCC Letter.

> ### b.  *Fifth Third Failed To Provide Proper Closed-Ended Loan Disclosures*

For closed-ended loans like Early Access loans, TILA requires that all of the essential credit information, *including in particular the actual APR*, must be disclosed <u>before</u> the credit is extended.  Fifth Third did not disclose an actual APR, nor did it even disclose a range of possible APRs.  Instead, it disclosed only a theoretical 120% APR based on a 30-day loan term it knew to be exceedingly unlikely.

Under TILA, a closed-ended APR is calculated as follows: "the annual percentage rate shall be the nominal annual percentage rate determined by multiplying the unit-period rate by the number of unit-periods in a year." 12 C.F.R. § 1026.22, Appendix J.  The term "unit-period" is clearly defined as "the term of the transaction."  *Id*.  For Early Access loans, which have terms of between 1 and 35 *days*, the only relevant time interval is counted in days, not months. Therefore, under TILA, the only proper way to calculate an APR in the case of an Early Access loan is to do so by taking into consideration the actual number of days the loan was outstanding. As discussed above, Fifth Third's APR never did this, instead hewing to its 30-day repayment conceit.

The official commentary to Regulation Z specifically addresses situations like those at play with Plaintiffs' Early Access loans.  In regards to "[a]n obligation whose maturity date is

determined solely by a future event" the commentary states "[t]he disclosures should be based on the creditor's estimate of the time at which the specified event will occur . . . ." Reg. Z, Official Interpretations § 1026.17(c)(5)-2.

That means Fifth Third should have disclosed APRs for Early Access loans that corresponded to the actual length of loans—perhaps either as a sliding scale or at multiple repayment points. At the very least, Fifth Third should have provided an estimate based on its knowledge that a huge number of Early Access loans would not remain outstanding for a full 30 days. Alternatively, Fifth Third should have determined when the consumer's next direct deposits were anticipated and calculated the APR on that basis. Because Fifth Third did none of these things, it violated TILA and presented a deceptive and false APR representation.

### 5. The APR Disclosure Is Inaccurate Even If Early Access Loans Are Open-Ended.

Even if this Court finds Early Access loans to be open-ended credit—a finding, as above, that could be made only at a later stage of the litigation, because it is fact-dependent—Fifth Third's Early Access disclosure still would not be sufficient under TILA.

For open-ended credit, TILA requires accurate APR disclosures both prior to a loan (*see* Reg. Z, § 1026.6 and during the loan's life-cycle. *See* Reg Z, § 1026.7. The relevant requirements for open-ended credit—and Fifth Third's compliance or noncompliance with the requirements—are discussed in turn below. But it is important to note, as a threshold matter, that Regulation Z requires accurate disclosures for all loans (whether open-ended or closed-ended):

> Disclosures shall reflect the terms of the legal obligation between the parties. If any information necessary for accurate disclosure is unknown to the creditor, it shall make the disclosure based on the best information reasonably available and shall state clearly that the disclosure is an estimate.

Regulation Z, § 1026.5(c).  As Plaintiffs allege, Fifth Third knew full well most loans would never remain outstanding for 30 days—yet it designed a set of TILA disclosures based on that very assumption.  That alone is an independent basis for a TILA violation.

And the overarching TILA purposes of clear, fair, and common-sense disclosures apply with equal force to open-ended loans.  Here the APR Fifth Third provided was arbitrary at best and intentionally deceptive at worst; indeed, Fifth Third's argument means that it could have presented _any_ APR to consumers—even one that resulted in an APR of 10%  or 1% for the same Early Access loans.  TILA—a statute expressly designed to allow consumers to compare the cost of credit—does not countenance such arbitrary and unhelpful disclosures.

If Early Access loans are open-ended, as Fifth Third argues, its disclosures violate these general TILA provisions.  But they also violate specific TILA provisions for open-ended credit disclosures in several different ways, as discussed below.

### a.      *Open-End Creditors Must Disclose An Accurate Periodic Rate*

Creditors must disclose the *periodic rate* that is used to compute the finance charge on loans or cash advances.  Reg. Z., § 1026.6(b)(2)(i).  A "periodic rate" is a "rate of finance charge that is or may be *imposed* by a creditor *on a balance* for a day, week, month, or other subdivision" (emphases added).  The CFPB Official Interpretations say of "periodic rate" that it "does *not include initial one-time transaction charges*, even if the charge is computed as a percentage of the transaction amount."   Reg. Z, Official Interpretations, § 1026.2(a)-21. Because, according to Fifth Third's contention, there is only a flat "transaction fee" for Early Access loans and no "interest" whatsoever, there is no "periodic rate" for Early Access loans. Nor is there any "period" on which to impose the "periodic rate," according to Fifth Third, since the fee is only imposed once, up-front.

22

**b.    *Open-End APR Disclosure Must Be Calculated According To TILA***

For open-ended credit, the periodic rate discussed above must in be expressed as an APR, calculated to according to the TILA and Regulation Z, § 1026.14(b).  *Id*.  That provision, 1026.14(b), states that the APR "shall be computed by multiplying each *periodic rate* by the number of periods in a year" (emphasis added).  Regardless of the number of "periods" in a year (and the Parties here disagree on the appropriate term of a period),[14] if there is no periodic rate, there can be no valid APR because there is no periodic rate upon which to base it.  Yet Fifth Third disclosed a 120% APR for all Early Access loans.  Indeed, in violation of TILA, Fifth Third disclosed an APR that was not the "periodic rate" expressed over a year, but an arbitrary, yearlong extrapolation of a flat transaction fee.  Such an APR was not consistent with TILA dictates for open-ended credit.  At best, it was an incorrect *closed-ended* APR disclosure.

**c.    *A "Periodic Rate" Must Be Applied To An Outstanding Balance***

For a periodic rate to actually result in a finance charge, it has to be applied to an *outstanding balance*.  The size of the outstanding balance determines the real-dollar finance charge assessed to the borrower.  Because the "outstanding balance" plays a determinative role in the actual finance charge assessed, under TILA a creditor is required to disclose the method of computing the outstanding balance on which finance charges will be computed.  Official Interpretations, Reg. Z., § 1026.6(b)(3)-2.  The creditor must provide a clear explanation of the "balance computation method."  *Id*., § 1026.6(b)(2)(vi)-1.  Fifth Third used an eccentric balance computation method here—it did not give borrowers immediate credit for repayments on Early

---

[14] Fifth Third's argument that the correct "unit" period is based on "billing cycle" is wrong.  Fifth Third's reliance on the TILA definition of "billing cycle" is totally irrelevant.  "Billing cycle" means "the interval between the days or dates of regular periodic statements." § 1026.2(a)(4).  The Official Interpretations merely say of "billing cycle": "determines the intervals for which periodic disclosure statements are required."  It says nothing at all about such intervals playing any defining role in determining APR.

Access loans, and instead assumed all loans remained outstanding for 30 days—then never informed borrowers of its peculiar method.  That is one violation of TILA.

Next, if a creditor is *not* going to apply a loan payment immediately, it must notify borrowers expressly of this fact.  If a creditor does not deduct payments made *during* the billing cycle, that fact must be disclosed.  Reg. Z, § 1026.7(b)(5).  For example, the creditor should state something similar to: "[c]redits received after the 15th of the month will not be deducted in determining the finance charge."  Reg. Z, Official Interpretations, § 1026.7(b)(5)-6.  Again, Fifth Third did not give consumers credit for their repayments immediately.  Instead, it acted as though loans were not paid back until 30 days had passed, at which point it supposedly assessed its nonexistent "periodic rate" on the entire value of the loan.  But it did not notify borrowers of this peculiar policy.  This is another TILA violation.

Compare this to common practice in the credit card industry, where creditors apply the periodic rate to an "daily balance" or an "average daily balance."  In that common scenario, transactions and new payments are calculated *daily* on an account, then the periodic rate is applied to determine a real dollar finance charge.  As such, a credit card user is getting the benefit—via the daily balance calculation—of his payments on his account.  Nothing similar happens with Fifth Third's supposedly open-ended Early Access loans.

### d.       TILA Requires Accurate APR Disclosure On Periodic Statements

Once a consumer has taken advantage of the "open-ended" credit offered, the creditor must send accurate periodic statements reflecting the loan.  Reg. Z, § 1026.7.  Among other things, the periodic statement must disclose the *periodic rate used to compute the interest charge, expressed as an APR*.  Reg. Z, § 1026.7(b)(4)(i).  To determine that periodic statement APR, the creditor must multiply the periodic rate by the number of periods in a year.  *Id*., § 1026.14(b).  The periodic statement must also disclose the balance on which that periodic rate

24

is applied, and must explain how that balance was determined. *Id.*, § 1026.7(b)(5). That balance must be explicitly labeled at "Balance Subject to Interest Rate." *Id.*

As above, Fifth Third does not properly disclose a periodic rate or an APR in pre-loan disclosures. It made those same mistakes on its post-loan bank statements. Indeed, Fifth Third's bank statements again stated a 120% APR, supposedly based on a nonexistent periodic rate, and this was doubly false by the time the bank statement was issued and it was entirely clear that Plaintiffs had not received use of the loaned money for a full month. CAC, ¶ 54, 60, 66, 70, 76, 82, 88. Fifth Third thus provided false APRs on bank statements, after the fact. This is another TILA violation.

In addition, Fifth Third fails to provide the "Balance Subject to Interest Rate" on its periodic statements. *See* CAC, Ex. B. That is a separate TILA violation.

In summary, viewing Early Access loans as "open-ended" credit has rather dire consequences for Fifth Third. The 120% APR disclosure is both inaccurate under TILA and—if viewed as part of an open-ended credit disclosure—it is the source of myriad other TILA violations. And this is yet another clear indication that Early Access loans are a bad fit for the term "open-ended." The inability of Fifth Third to comply with a large number of open-ended disclosure requirements under TILA supports the conclusion that the Early Access loans are, in fact, actually closed-ended credit.

### C. Fifth Third Violated EFTA

Plaintiffs allege that Fifth Third violated EFTA because it *conditioned* the extension of credit to a consumer on the consumer's repayment by means of a preauthorized electronic funds transfer. 15 U.S.C. § 1693k(1). Fifth Third argues that (1) Early Access loans are not conditioned on repayment by electronic funds transfer and (2) Early Access loan repayment did not occur on "substantially regular" intervals. But Fifth Third's argument is directly contradicted

25

by Fifth Third's own Early Access Contract, which clearly indicates that, as an initial matter, no loan would be granted without an agreement for direct debits from a Fifth Third checking account.  *See* Doc. 68-1 at 4 ("You must repay each Advance and related transaction fee within 35 days.  *Any Advance and related transaction fees will automatically be deducted by the Bank from your Associated Checking Account* at the time of your next direct deposit of $100 or more") (emphasis added).   Indeed, if Fifth Third believed direct electronic repayment could be jeopardized (by, for example, a cessation of direct deposits to an account), it would simply bar future loans.  *See id.* at 2 "(The Associated Checking Account must have received at least one direct deposit of $100 or more in two of previous four consecutive calendar months, one of which must have been received within the past 35 calendar days.").   Fifth Third cannot now disclaim this essential part of the Early Access loans and argue that somehow electronic funds transfers were not a core aspect of the entire program.

Next, contrary to Fifth Third's argument, the *possibility* of a manual payment after the loan is issued, or the *possibility* that electronic payments did not actually occur with regularity after the loan was issued, does not mean the Early Access loan credit was not *conditioned* on electronic funds transfer in the first place.  Fifth Third argues that Early Access loan repayments were not "preauthorized electronic fund transfers" within the meaning of EFTA because they *might not have occurred* at substantially regular intervals.  But the reality is that Fifth Third gave itself the right to debit repayments from each incoming direct deposit on a borrower's account.  The electronic funds transfers were thus authorized to occur at "substantially regular" intervals— namely, the time of a borrower's regularly scheduled direct deposits.   Whether they actually happened, after the fact, is irrelevant.  *See O'Donovan v. Cashcall, Inc.*, No. 08-3174 MEJ, 2009 WL 1833990 (N.D. Cal. June 24, 2009) (finding borrower stated EFTA claim; fact that

26

agreement allowed for *later cancellation* of electronic payments did not shield lender from liability for *conditioning credit* on electronic repayments).

Similarly, in *Mitchem v. GFG Loan Co.*, 99 C 1866, 2000 WL 294119 (N.D. Ill. Mar. 17, 2000), the bank lender asserted compliance with EFTA because its loans were closed-end, two-week loans which would not require debits at recurring or substantially regular intervals.  The court rejected the lender's argument, noting that the broad language in the bank's loan agreement itself suggested repeated or recurring debits by authorizing the lender to "effect payments … as such amounts come due" by debiting Plaintiffs' account.  *Id*., at *7.  The court ultimately concluded that, although the loan agreement did not contain the term "electronic funds transfers" or other terms identified in EFTA, its ambiguous language could authorize recurring transfers in violation of EFTA, requiring denial of the bank's motion to dismiss.  *Id*., at *9.

Fifth Third relies on three inapposite cases to support its claim that Early Access loans do not entail repayment at substantially regular intervals.[16]  In *Okocha*, the bank debited the customer's deposit account from time to time when his overdraft account was overdrawn.  But there was no extension of credit *conditioned* on an electronic transfer; the bank took the funds necessary to cure overdrafts *after* they occurred.  In *Puglisi*, a consumer settled a debt with a collector and agreed to make two repayments.  Those two payments were not debts agreed to in advance, or debts to be repaid at substantially regular intervals, and therefore were not covered by the EFTA.  And in *Sharkey v. NAC Mktg. Co., LLC*, 12 C 4354, 2012 WL 5967409 (N.D. Ill. Nov. 28, 2012), "[t]he transfer at issue here was not authorized in advance, nor was it set to recur at substantially regular intervals."  *Id*., at *3.  The court's focus in *Sharkey* was thus on what took place in advance, not what took place after the fact.  That case actually supports Plaintiffs'

---

[16] *Okocha v. HSBC Bank USA, N.A.,* No. 08-8650, 2010 WL 5122614 (S.D.N.Y. Dec. 14, 2010); *Puglisi v. Debt Recovery Solutions, LLC.,* 822 F. Supp. 2d 218 (E.D.N.Y. 2011).

position here.

In sum, to obtain an Early Access loan, customers had to agree to allow ongoing electronic transfer repayment according to the substantially regular schedule of their direct deposits.  Whether or not recurring transfers actually took place after this initial agreement, Fifth Third had the *right* to make multiple debits, at regular intervals—and it is this unconditional right that violated EFTA.

### D. The Choice Of Law Provision Does Not Bar Plaintiffs' Non-Ohio State Law Claims

Fifth Third argues that an Ohio choice of law provision that covers "issues related to interest and related charges" bars all non-Ohio state law claims.  Doc. 72-1, at 13.  But the vast majority of Plaintiffs' state law claims do not relate to "interest" at all.  Indeed, Fifth Third claims there is no "interest" at all on Early Access loans.  Instead, the crux of the case is a misstated APR and related deceptions.  This distinction between claims regarding APR misrepresentations and claims regarding interest is reflected in Plaintiffs' Complaint consistently: the one claim that does implicate "interest"—the Section 1831d usury claim— makes exclusive reference to Ohio usury law, consistent with the Contract's choice of law provision.  That is the one claim that must decided with exclusive reference to Ohio law.  But the choice of law provision cannot bar Plaintiffs' non-Ohio common law and consumer protection claims.

Moreover, Plaintiffs' claims here are not exclusively dependent on the Contract, or on a contract breach, as discussed herein.  Courts construe contractual choice of law provisions narrowly, and do not apply such provisions to claims not dependent on the contract.  *See, e.g., Morrison v. YTB International, Inc.*, 649 F.3d 533, 537 (7th Cir. 2011) ("*Avery* holds that a choice-of-law clause is not dispositive, because a claim under the Consumer Fraud Act is

independent of the contract"). Fifth Third's authority is not to the contrary. In *Johnson v. Ventra Group, Inc.*, 191 F.3d 732, 737-738, 741 (6th Cir.1999), the alleged fraud at issue dealt with an oral promise to honor the franchise contract at issue, which contained the choice-of-law provision, and plaintiff never asserted a non-contractual claim, not related to the franchise contract. Likewise, *Banek, Inc. v. Yogurt Ventures U.S.A.*, 6 F.3d 357, 359 (6th Cir. Mich. 1993) (emphasis added), the court found that "[t]he claims of fraud and misrepresentation that plaintiff has asserted here are directly related to the franchise agreement" and "[h]ad these claims only been tangentially related to the franchise relationship, we would be much more inclined to find the choice of law provision not applicable." In *CIC Group, Inc. v. Mitchell*, 2013 WL 774175, *4-5 (N.D. Ohio Feb. 27, 2013), the court found that an agreement's choice-of-law provision applied because (1) under Missouri law, general allegations of fraud in the inducement are insufficient to raise the issue that the forum-selection clause in the contract is unenforceable; (2) the choice-of-law provision in the Agreement, which extended to "all questions" relating to the validity and interpretation of the contract, was broad enough to encompass the plaintiff's tort claims. Ohio law is at issue here, as is a narrow—not a broad—choice of law provision.

In any case, *CIC Group, Inc. v. Mitchell* is at odds with the prevailing law on this issue. *See, e.g., Inacom Corp. v. Sears, Roebuck and Co.*, 254 F.3d 683, 688 (8th Cir. 2001) (provision that "[a]greement shall be governed by and construed in accordance with the law of the State of Illinois" held not to govern tort claims); *Magellan Real Estate Investment Trust v. Losch*, 109 F. Supp. 2d 1144, 1158 (D. Ariz. 2000) (provision that "agreement shall be governed by and construed in accordance with the laws of the province of Ontario and the laws of Canada" held not to govern tort and statutory claims.).

### E. Plaintiffs State Valid Claims Under The Kentucky And Illinois Consumer Protection Laws

Fifth Third argues that Plaintiffs' Illinois and Kentucky statutory consumer protection act claims fail because those claims are based on terms of the Contract and, thus, are not cognizable under the statutes. However, Plaintiffs' statutory fraud claims are properly based on Fifth Third's deceptive APR representations. When Fifth Third provided false comparisons between its loans and other credit products; when Fifth Third prominently promised a 120% APR for all loans, then only provided it only for some; and when Fifth Third induced persons to take Early Access loans in the first place based on these inaccurate representations, it violated state consumer protection laws. The TILA violtaions described above also provide an independent basis for relief under state consumer protection law.[17]

Even if the Court finds no Contract breach, Plaintiffs may still prevail on these consumer protection claims. For example, Fifth Third's "methodology" language, although flawed and deceptive, was the *only* possible "warning" consumers received that Fifth Third's APR was inaccurate. And even that "methodology" was dwarfed by prominent 120% APR representations that said all loans would have that APR. In the agreement alone, Fifth Third made two other, bold print, 120% APR representations—with no qualifiers, no methodologies, and no examples. (One of those was on the very first page of the agreement.) Fifth Third now argues those promises should not be taken seriously, since they were supposedly disclaimed by a small-print

---

[17] Consumers are commonly allowed to bring claims under state consumer protection laws seeking additional remedies beyond those available under TILA. *Monaco v. Bear Stearns Residential Mortg. Corp*., 554 F.Supp.2d 1034, 1038 (C.D. Cal. 2008) (consumer claim under state consumer protection law not superseded by TILA where consumer was seeking additional remedies because additional penalties are not inconsistent with TILA but rather provide greater protection); *Quezada v. Loan Ctr. of Cal., Inc*., No. 08-177 WBS KJM, 2008 WL 5100241 (E.D. Cal. Nov. 26, 2008) (fact that UDAP statute merely provides additional protections to consumers and is not inconsistent with TILA); *In re Hollis*, No. 07-22759 (KCF), 2009 WL 3030125 (Bankr. D.N.J. Sept. 17, 2009) (supplemental remedies provided by state laws, including common law, do not conflict with TILA); *see also In re Ferrell*, 358 B.R. 777, 792 (B.A.P. 9th Cir. 2006) *aff'd*, 539 F.3d 1186 (9th Cir. 2008) (TILA does not preempt consistent state consumer protection laws regarding closed-end loan disclosures).

APR "methodology" buried deep in the Contract (as discussed above). Even if that were true (as discussed above, it is not), consumer protection law bars the making of a prominent disclosure that is then undermined by a non-prominent one.

Indeed, courts routinely reject Fifth Third's argument that it can make prominent misrepresentations then disclaim those misrepresentations with a buried disclaimer. *See, e.g., Williams v. Gerber Products Co.,* 552 F.3d 934, 939 (9th Cir. 2008) (with respect to claims made on the front of a food package, "reasonable consumers should [not] be expected to look beyond misleading representations on the front of the box to discover the truth from the ingredient list in small print on the side of the box."). *See also, e.g., Hughes v. Ester C Co.*, 930 F. Supp. 2d 439, 464 (E.D.N.Y. Mar. 15, 2013) (a disclaimer that "this product is not intended to diagnose, cure, treat or prevent any disease" does not "eliminate[] the possibility of a reasonable consumer being misled"); *FTC v. US Sales Corp.*, 785 F. Supp. 2d 737, 745 (N.D. Ill. 1992) (rejecting a defendant's argument that a disclaimer was sufficient to modify the overall impression of an advertisement).

Plaintiffs' claims are not mere "breach of contract" Contract claims, as Fifth Third argues, and they present colorable claims under both the Illinois and Kentucky consumer protection statutes.

### 1. Illinois Consumer Fraud Act.

Fifth Third argues that Plaintiffs may not restate a claim for breach of contract as Illinois statutory consumer claims because Plaintiffs were charged appropriately pursuant to the Contract. Doc. 72-1, at p. 27. But an ICFA[18] claim may proceed despite the presence of an express Contract if the claim is based on something more than a simple breach of the contract.

---

[18] Illinois Consumer Fraud Act, 815 ILCS 505/1 to 515/12.

*Pappas v. Pella Corp.*, 363 Ill. App. 3d 795 (2006).  *See also*, *Petri v. Gatlin*, 997 F. Supp. 956, 967-68 (N.D. Ill. 1997) (denying motion to dismiss where natural gas supplier lured plaintiffs into contracts with false representations about the savings plaintiffs would realize); *Rumford v. Countrywide Funding Corp.*, 678 N.E.2d 369, 373 (Ill. App. 1997) (reversing trial court's dismissal of an ICFA claim against a mortgage lender because claim was based on pattern of misrepresentations to customers).  Even *Golembiewski v. Hallberg Ins. Agency*, 635 N.E.2d 452, 460 (Ill. App. 1994), a case Fifth Third relies on, noted that while an "isolated breach of contract claim" by an insurance company would not violate the ICFA, a "repeated practice" could.

For the reasons described above, Plaintiff Fyock's claims cannot be classified as a garden variety breach of contract claim.  *Petri*, 997 F. Supp. at 968 ("plaintiffs allege not just that the defendants regularly breached their natural gas contracts, but also that the defendants lured consumers into signing those contracts by disseminating promotional brochures containing misrepresentations of material facts.").[19]  Moreover, as explained below, Plaintiffs' ICFA claim is also properly based on Fifth Third's unfair acts and practices in charging an exorbitant interest rate irrespective of whether any Contract terms were violated.

"The [ICFA] is a regulatory and remedial statute intended to give broad protection to consumers, borrowers, and business people against fraud, unfair methods of competition, and

---

[19] Fifth Third's authority is wholly distinguishable.  In *Nilsson v. NBD Bank*, 313 Ill. App. 3d 751, 765 (Ill. App. Ct. 1st Dist. 1999), the court held that at trial (1) plaintiff presented no evidence that defendant engaged in any deceptive trade practice that proximately caused the type of damages incurred by plaintiff; and the (2) evidence adduced during the trial showed that plaintiff and the defendant merely disagreed on the interpretation of the contract between them, which resulted in a simple breach of contract.  In three other cases, the respective courts dismissed plaintiffs' ICFA claims because plaintiffs merely alleged deceptive trade practices on the basis of defendant's breach of contract allegations. *Central Diversey M.R.I. Center, Inc.*, 952 F.Supp. 575, 577-578 (1996) (dismissing a Consumer Fraud Act claim where the business plaintiff, a consumer of the defendant's debt collection services, alleged that the defendant promised to perform services it never intended to perform as "essentially a breach-of-contract claim," and the plaintiff never alleged any broad misrepresentation to the public or other consumer nexus); *Long*, No. 00 C 5842, 2001 U.S. Dist. LEXIS  24135, at *3-4 (N.D. Ill. Jan. 4, 2001) (finding plaintiff's allegations constituted a breach of contract claim and that there was no viable allegations of deceptive or unfair trade practices); *Exchange Nat'l Bank*, 108 Ill. App. 3d 212, 215 (Ill. App. Ct. 3d Dist. 1982) (dismissing ICFA claim because "the only actual controversy is whether an isolated breach of contract occurred," and that there was no allegation that the practices were "part of a pattern" of defendant's activities).

other unfair and deceptive business practices." *Ramirez v. Smart Corp.,* 371 Ill. App. 3d 797, 805, 863 N.E.2d 800 (3d Dist. 2007). Fifth Third engaged in unfair acts and practices in charging an usurious APR for its Early Access loans. The Illinois Supreme Court has delineated the following objective factors to determine whether a practice is "unfair" under the Illinois Consumer Fraud Act: (1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive or unscrupulous; and (3) whether it causes substantial injury to consumers *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 417–18, 775 N.E.2d 951 (2002). "All three factors do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Id.* at 418. Contrary to Fifth Third's arguments, these factors do not require analysis of whether a breach of contract occurred.

Here, Fifth Third's acts and practices in charging and collecting usurious and unconscionable interest rates for its Early Access loans offend public policy. Plaintiffs suffered substantial injury as a result of Fifth Third's acts and practices in that the cost to them for the Early Access loans was exponentially higher than 120% APR. Given the exorbitant APR paid by Plaintiffs, Fifth Third's conduct should be deemed offensive to public policy and immoral, unethical, oppressive or unscrupulous.

## 2. Kentucky Consumer Protection Act.

Plaintiffs have sufficiently pled that Fifth Third violated the Kentucky Consumer Protection Act ("KCPA").[20] To recover under the KCPA, Plaintiffs must simply prove that Fifth Third engaged in "unfair, false, misleading or deceptive acts" that involved "substantial wrongs committed against a clearly protected interest and rights." *See Capitol Cadillac Olds, Inc. v. Roberts*, 813 S.W.2d 287, 291 (Ky. 1991) (citations omitted). Fifth Third cannot point to a

---

[20] Kentucky Consumer Protection Act , KRS 367.120.

33

Kentucky case[21] where conduct that violated the KCPA was excused simply because of a contractual relationship between the parties, and *Capitol Cadillac* actually stands for the opposite.

In *Capitol Cadillac*, the Plaintiffs alleged breach of a repair contract and alleged that the defendant attempted to deceive them into believing that the defendant performed the contract. *Id.* at 291. The court held that "[n]ot every failure to perform a contract is sufficient to trigger application of" the KCPA. *Id.* The court analogized KCPA claims in the presence of a contract to insurance bad faith cases, holding that both required proof of a certain level of conduct. *Id. (citing Feathers v. State Farm Fire and Casualty Co.,* 667 S.W.2d 693 (Ky. App. 1983). In finding for the defendant in *Capitol Cadillac,* the court distinguished between "unfair, false, misleading or deceptive acts" and "simple incompetent performance of contractual duties" – with the former violating the KCPA and the latter not. *Id.* However, even the latter could rise to the level of KCPA violation if the consumer can show "some element of intentional or grossly negligent conduct is also present." *Id.* (citations omitted). Because the plaintiffs could not do so in *Capitol Cadillac*, they could not maintain an action under KCPA.

Kentucky law simply does not immunize Fifth Third for violations of the KCPA just because their actions *involved* a contract, and Fifth Third cannot point to any case that exempts contracts from KCPA. Additionally, Fifth Third's conduct qualifies as unconscionable conduct irrespective of whether any breach of contract occurred. The KCPA provides broad protection to

---

[21] The primary case Fifth Third cites is a California case analyzing an insurance contract under *California's* unfair practices law, not Kentucky law. *See George v. Auto. Club of S. Calif.*, 135 Cal. Rptr. 3d 480, 494 (Cal. Ct. App. 2011). Numerous Kentucky cases involve Plaintiffs bringing both KCPA and breach of contract claims. *See, e.g., Sparks v. Re/Max Allstar Realty, Inc.* 55 S.W.3d 343 (Ky. Ct. App. 2000); *see also Harman v. Sullivan Univ. Sys.*, 2005 WL 1353752 (W.D. Ky. June 6, 2005); *Wells v. Craig & Landreth Cars, Inc.*, 474 Fed. Appx. 445 (6th Cir. Ky. 2012).

consumers. *Craig & Bishop, Inc. v. Piles*, 247 S.W.3d 897, 904 (Ky. 2008) (citing KRS § 367.120). The KCPA provides that unfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce are unlawful. KRS § 367.120. Under the KCPA, unfair means unconscionable. *Id.* Fifth Third's conduct is unconscionable in that it applied APRs well in excess of 120% and even as high as 3,650%, which substantially injured Plaintiffs and the putative Class members.

### F. Plaintiffs Have Adequately Alleged An Ohio Fraud In The Inducment Claim

Here, the Contract is *both* an agreement and a prior disclosure. That is, the documents that contain the contractual terms for the Early Access program are also the documents provided by Fifth Third to consumers to provide information about the Early Access program. For this reason, it is not accurate to say that the fraud claim "arises from the contract" in the way Fifth Third argues. Doc. 72-1 at 15. The fraud claim is not for a breach of the contract, but for an inducement to enter the Contract. In materials the Bank made available to borrowers prior to taking an Early Access advance, Fifth Third advertised the 120% APR *and encouraged customers to use that APR to shop the market **before** entering into the Early Access Contract.* Terms & Conditions at 3.

Fraud in the inducement raises separate and independent legal duties that are considered outside of the Contract. *See Integrated Molding Concepts, Inc. v. Stopol Auctions,* 2007 WL 3001385 at *6-*7 (N.D. Ohio 2007) (plaintiff can raise both a claim for promissory fraud and breach of contract); *Res. Title Agency, Inc. v. Morreale Real Estate Services, Inc.*, 314 F.Supp.2d 763, 774 (N.D. Ohio 2004) (in addition to a breach of contract claim, plaintiff may assert a fraud in the inducement claim). Ohio courts have held that fraudulent inducement claims, based on a party's intent not to perform their terms at the time of contracting, are viable even if the claim

arises from the same contractual relationship as the breach of contract claim. *Id. See also, A.R. Fuhlbrigge, M.D., Inc. v. Midwest Med. Consortium, Inc.,* 1993 WL 452068 at *3-*4 (Ohio Ct. App. 6d 1993). Fifth Third's representation that these loans carried an interest rate of 120% was a fraudulent inducement made to entice borrowers into entering into these loans.

A misrepresentation made by and through a contractual term to mislead the other party into entering into a contract constitutes fraud, even where the inducing party cloaks their fraud in the terms of the contract. *ITS Fin., LLC v. Advent Fin. Services, LLC*, 823 F.Supp.2d 772, 781 (S.D. Ohio 2011) ("plaintiff does not contend that Defendants committed fraud by entering into the contract without any intention of performing according to the contract's terms, but instead that Defendants specifically intended to perform the contract pursuant to an interpretation of its terms that was contrary to the interpretation represented by Defendants to Plaintiffs during negotiations, and upon which Plaintiffs relied to its detriment in foregoing the Agreement. Plaintiffs has made a *prima facie* case, where it asserts that Defendants made a promise which induced its reliance, and at the time such promise was made, Defendants had no intention of keeping the promise").

Dismissal of the fraud claims at this stage is also inappropriate because Plaintiffs are allowed to plead fraud and breach of contract in the alternative.[22] Indeed, it is only when a contract is determined by the court to be valid and applicable to the subject matter at issue (which this Court has not yet found) that it precludes an alternative claim.[23]

---

[22] *Iacono v. Anderson Concrete Corp.* 42 Ohio St.2d 88, 92 ("Civ.R. 8(E)(2) permits alternative or hypothetical pleading, or even the use of inconsistent claims."); *Levin v. Nielsen*, (8th Dist. 1973) 37 Ohio App.2d 29, 37 ("Appellee's claim sounds in tort, as well as in contract. Our rules of procedure do not require that she elect between alternative, or even inconsistent theories, instead permitting liberal joinder. Civil Rule 8(A) and (E), and Rule 18."); *see also U.S. ex rel. v. Boeing Co.*, 184 F.R.D. 107, 112-113 (S.D. Ohio 1998) (claims of breach of contract, fraud and unjust enrichment can be pled in the alternative).

[23] *Hrnyak v. Mid-West Nat'l Life Ins. Co.*, 2009 WL 735851 at *14-15 (N.D. Ohio Mar. 20, 2009) (declining to dismiss alternative claim of unjust enrichment on a motion to dismiss because at that point in the litigation "the Court will not find definitively that the insurance contract is valid, enforceable, and governs this dispute."); *Regal*

### G.    **Plaintiffs Have Adequately Alleged A Claim For Conversion**

Contrary to Fifth Third's argument, Plaintiffs have alleged that Fifth Third took specific and identifiable funds from their checking accounts.  In fact, Fifth Third "took back" the same Early Access loan funds it loaned well prior to the promised one-month loan term, then took an additional 10% out of Plaintiffs' readily identifiable "next direct deposits."  A plaintiff may claim conversion of money where the defendant is obligated to pay specifically identifiable funds to the plaintiff.  *Davis v. Flexman,* 109 F.Supp.2d 776, 808 and n. 30 (S.D.Ohio 1999). This does not apply only to tangible money in the form of a "bag of coins," but to *any* specifically identifiable money, *including funds sequestered by their source or use*.  *Id.*  Here, the monies taken were identifiable both by source and by use (either funds from an Early Access loan or funds from Plaintiffs' direct deposits).  This fact alone distinguishes each of the cases Fifth Third cites.

Several courts have recently upheld conversion claims in similar circumstances.  *In re Checking Account Overdraft Litigation*, 694 F.Supp.2d 1302 at 1322-1323 (S.D. Fla. 2010) ("interference with Plaintiffs' property interest in the funds in their accounts constitutes a cause of action for conversion."); *Hawthorne v. Umpqua*, 2012 WL 1458194, at *2 (N.D. Cal. Apr. 26, 2012) ("Here, Plaintiffs allege that [the bank] has collected for itself specific and readily identifiable funds from their accounts to pay for wrongfully collected overdraft fees and that it continues to retain these funds without their consent.  There is no indication that the bank intends to return those funds.  These allegations are sufficient to state a claim for conversion"); *see also*

---

*Cinemas, Inc. v. W & M Properties*, 90 F. App'x 824, 832 (6th Cir. 2004) ("Defendants' argument that, every time a party claims both breach of contract and fraud, the party cannot recover fraud damages that duplicate the damages that it claimed under breach of contract even where it has been determined there was no breach of contract, is flatly unreasonable.  Not only does Ohio law not support this proposition, but reading it that way would result in a penalty for arguing in the alternative").

*Hughes v. TD Bank, N.A,* 856 F.Supp.2d 673, 680 (D.N.J. 2012). Fifth Third has provided no basis for the dismissal of the conversion claim.

### H.   Plaintiffs Have Adequately Alleged A Claim For Unjust Enrichment

Contrary to Fifth Third's assertion, Plaintiffs can maintain both a breach of contract and unjust enrichment claim at this stage of the litigation. Plaintiffs are allowed to plead these causes of action as alternative claims. Civ.R. 8(E)(2); *Firelands Reg'l Med. Ctr. v. Jeavons*, 2008 Ohio 5031, ¶ 31 (6th Dist.); *Hrnyak v. Mid-West Nat'l Life Ins. Co.*, *supra*; *Cheers Sports Bar & Grill v. Direct TV, Inc.*, 563 F.Supp.2d 812, 819 (N.D. Ohio 2008).

Additionally, an unjust enrichment claim can proceed with a breach of contract claim when the existence of the express contract is in dispute or where there is evidence of bad faith, fraud or illegality. *Resource Title Agency*, 314 F.Supp.2d at 772 (citations omitted). Plaintiffs' Complaint alleges Fifth Third committed fraud. CAC, ¶¶ 217-260. Dismissal of the unjust enrichment claim at this juncture is improper.

### I.   The Voluntary Payment Doctrine Has No Application Here

Fifth Third claims that Plaintiffs' recovery under all state law and common law claims is barred by the voluntary payment doctrine, which holds that "[i]n the absence of fraud, duress, compulsion or mistake of fact, money, voluntarily paid by one person to another on a claim of right to such payment, cannot be recovered merely because the person who made the payment mistook the law as to his liability to pay." *State ex rel. Dickman v. Defenbacher*, 151 Ohio St.391, 395, 86 N.E.2d 5 (1949). But can be no "voluntary payment" unless a party is informed of the facts necessary to form an opinion. Plaintiffs have alleged that Fifth Third withheld those very facts by disclosing an inaccurate APR. It would be manifestly unfair to find that any of the Plaintiffs voluntarily paid for Early Access loans that were misrepresented.

Moreover, fraud allegations like Plaintiffs' preclude the application of the voluntary payment doctrine. See *Scott v. Fairbanks Capital Corp.*, 284 F.Supp.2d 880, 894 (S.D. Ohio 2003) (no voluntary payment "where the payment has been procured by a fraud."); *see also Franklin v. CitiMortgage, Inc.*, 1:11-CV-608, 2012 WL 10192 (S.D. Ohio Jan. 3, 2012) (no voluntary payment "when plaintiff alleges fraud, duress, compulsion or mistake of fact.") (internal citation omitted); *State ex rel. Dickman* at 395 (same).

The cases relied upon by Fifth Third featured plaintiffs with full knowledge of the relevant facts. *Wears Kahn McMenamy & Co. v. JPMorgan Chase Bank, N.A.*, 2:12-CV-812, 2013 WL 1689030 (S.D. Ohio Apr. 18, 2013) (plaintiff had full knowledge of defendant's billing practices, which were disclosed on its invoices and were consistent with plaintiff's general obligation under the Note to only pay interest each month, and did not object to the amount owed under the invoices); *Salling v. Budget Rent-A-Car Sys., Inc.*, 672 F.3d 442, 445 (6th Cir. 2012) (applying voluntary payment doctrine where there was no mistake of fact and the plaintiff paid the charge in anticipate of filing a lawsuit).

To the extent the validity of Plaintiffs' fraud claims require further discovery, it would be premature to dismiss any of Plaintiffs' claims pursuant to the voluntary payment doctrine. *See Nelson v. Am. Power & Light*, 2:08-CV-549, 2010 WL 3219498 at *13-14 (S.D. Ohio Aug. 12, 2010) (denying to apply voluntary payment doctrine to dismiss claims regarding charges for attorneys' fees and costs paid by the plaintiff where the allegations of the complaint do not conclusively establish that, at the time she paid her electric bills, plaintiff knew what she had been charged for).

39

**J.      Plaintiffs' DIDA Usury Claim Is Not Barred By The Most Favored Lender Doctrine**

Fifth Third argues that it is insulated from Plaintiffs' Section 1831d usury claim by the "most favored lender" doctrine.  Specifically, Fifth Third (an Ohio state-chartered bank) argues that limits set by Ohio's usury law and incorporated into Depository Institutions Deregulation and Monetary Control Act ("DIDA")[24] are entirely inapplicable to it, and that it is entitled to charge any rate of interest it pleases on any type of loan it chooses.  But no court has adopted this unreasonable view of the most-favored lender doctrine.

The doctrine allows a bank to charge an interest rate equal to the highest of: (1) the rate allowed in the state where the bank is located; or (2) 1% in excess of the discount rate on ninety-day commercial paper at the Federal Reserve branch where the bank is located.  12 U.S.C. 85; 12 U.S.C. 1831d.  With respect to the highest rate allowed in the state where the bank is located, Fifth Third argues that because O.R.C. § 1151.21 and 1161.28 allow "building and loan" banks and savings banks, respectively, to charge unlimited interest on certain loans, the most favored lender doctrine allows Fifth Third to charge unlimited interest on any loan.

But OCC has issued clear regulations delineating the meaning of "most-favored lender," specifically restricting application of the doctrine to lenders making similar types of loans.  The OCC's interpretation of the NBA states "[i]f state law permits different interest charges on specified classes of loans, a national bank making such loans is subject only to the provisions of state law *relating to that class of loans* that are material to the determination of the permitted interest."  12 C.F.R. § 7.4001 (emphasis added).  In other words, the "most-favored lender" is not picked from a pool of all lenders operating in every banking activity in the state, but only from among lenders making the same types of loans.  Controlling case law concurs.  *Northway*

---

[24] Depository Institutions Deregulation and Monetary Control Act ("DIDA"), 12 U.S.C. 1831d.

*Lanes*, 464 F.2d at 862 (6th Cir. 1972) ("The legislative history of Section 85 therefore requires the conclusion that national banks may charge as much interest as savings and loan associations are allowed to charge on *equivalent transactions*") (emphasis added); *First Bank E. v. Bobeldyk*, 391 N.W.2d 17, 19 (Minn. Ct. App. 1986) ("The 'most-favored lender' doctrine allows a lender to charge only the highest permissible rate within the same class or type of loan or credit"); *Tikkanen v. Citibank (S. Dakota) N.A.*, 801 F. Supp. 270, 275 (D. Minn. 1992) (same).

In a nutshell, the doctrine asks whether another bank in Ohio could make the <u>same</u> loan at a better interest rate—not, as Fifth Third argues, whether another bank in Ohio could make <u>any</u> loan at a better interest rate.  Here, Fifth Third is a first-mover with respect to "deposit advance" loans.  Numerous federal agencies, including the OCC and FDIC, have construed such loans as equivalent to payday loans.[27] The question, then, is not whether a building and loan or savings bank could make <u>some</u> loan at an unlimited interest rate, but whether it could make <u>this particular type</u> of loan at an unlimited interest rate.

"Building and loan" banks and savings banks cannot make these payday loans. O.R.C. 1151.29-1151.2911 delineate a building and loan's lending power, and allow a building and loan to make only a narrow subset of loan types, almost all of which require that the loan be secured by real property.[28] A building and loan could not make a short-term loan secured only by the promise of future direct deposits.  Similarly, O.R.C. § 1161.36, 1161.37, 1161.39,

---

[27] *See, e.g.,* the OCC's Guidance on Supervisory Concerns and Expectations Regarding Deposit Advance Products, available at www.occ.gov/news-issuances/news-releases/2013/nr-ia-2013-182a.pdf, and the FDIC's Guidance on Supervisory Concerns and Expectations Regarding Deposit Advance Products, available at www.fdic.gov/news/news/press/2013/pr13105a.pdf.

[28] They are: (1) loans secured by improved property, O.R.C. § 1151.29; (2) loans secured by building sites that are ready for construction, *id.*; (3) loans secured by unimproved real estate (with special limits), *id.*; (4) collateral loans, *id.*; (5) land development loans, O.R.C. § 1151.293; (6) mobile home chattel paper, O.R.C. § 1151.294; (7) loans for improving, equipping, or furnishing real estate, O.R.C. § 1151.295; (8) other secured loans, O.R.C. § 1151.296; (9) student loans, O.R.C. § 1151.297; (10) development project loans, O.R.C. § 1151.297; (11) consumer loans related to real estate, O.R.C. § 1151.298, OAG No. 65-31 (1965), OAG No. 3113 (1962); and (12) issue credit cards, O.R.C. § 1151.299.

1161.41, 1161.42, 1161.44, 1161.46, 1161.50, 1161.52, 1161.57, 1161.60 delineate savings banks' lending authority, and allow a savings bank to make only a narrow subset of loan types, almost all of which require that the loan be secured by real property.[29] Savings banks also cannot make the type of short-term payday loans at issue in this litigation. Neither type of bank, then, is more favored with respect to loans like Fifth Third's Early Access payday loans.

Fifth Third's assertion that, pursuant to the Sixth Circuit's holding in *Begala*, the interest rate they are allowed to charge on *these specific payday loans* is unlimited does not hold up to scrutiny. The decisions in *Begala v. PNC Bank, Ohio, N.A.*, 214 F.3d 776, 782 (6th Cir. 2000) and *Kenty v. Bank One, N.A.*, 92 F.3d 384, 393-94 (6th Cir. 1996) do not support Fifth Third's position. The credit extensions at issue in *Begala* and *Kenty*, respectively, were the same type of loans or class of credit. The courts merely ensured that identical loans were allowed to carry identical rates of interest, irrespective of the bank offering the loan. Here, on the other hand, Fifth Third does not compete with building and loans and savings banks in its Early Access loans, so it is not entitled to take advantage of their interest rates. In sum, savings banks and building and loans—the support source of the "most favored" unlimited interest rates—cannot offer the type of loans Fifth Third offers through its "Early Access" program.

### K. Cash Advance Fees Are Included In Ohio Revised Code 1109.20

In its Motion, it is unclear whether Fifth Third is arguing: (1) that even if O.R.C. 1109.20 enforces an interest rate limit, it could not apply to the charges at issue because the charges are cash advance fees, rather than interest, and are excluded from the 25% limitation in the usury

---

[29] They are: (1) loans secured by improved real estate or farms, O.R.C. § 1161.36; (2) loans secured by unimproved real estate, O.R.C. § 1161.39; (3) loans for property alteration, repair, or improvement, O.R.C. § 1161.41; (4) education loans, O.R.C. § 1161.42; (5) loans secured by stock or securities, O.R.C. § 1161.42; (6) loans for commercial, corporate, business, or agricultural purposes, O.R.C. § 1161.46; (7) loans to its employees, O.R.C. § 1161.57; (8) interim financing for financing construction of modular housing; (9) lines of credit to builders, O.R.C. § 1161.57; (10) any loan authorized, on an individual, loan-by-loan, basis by the savings bank's board of directors, O.R.C. § 1161.60; and (11) issue credit cards, O.R.C. § 1161.44.

statute or (2) that the interest charged to Plaintiffs for each Early Access loan complies with O.R.C. § 1109.20(A) and is exempt from the 25% APR limitation because the borrowers agreed to the to 120% APR charged for each loan.  Regardless of which position Fifth Third is taking, the limitations set forth in O.R.C. § 1109.20 apply to Early Access loans.

Under the first argument, Fifth Third asserts that even if O.R.C. § 1109.20 could supply an interest rate limit, it could not apply to the charges at issue in Early Access loans because Fifth Third terms its "$10 for every $100" borrowed fee a "cash advance fee"—the latter which it argues is excluded from the 25% cap in the usury statute.  But whatever Fifth Third decided to name the finance charge it imposes for use of borrowed Early Access funds, it is in reality an interest charge.  Plaintiffs paid Fifth Third for the use of money that was not theirs for a period of time.  That is interest.  Even more, O.R.C. § 1109.20(B)—which Fifth Third totally ignores— expressly defines cash advance fees as interest:  "[f]or the purposes of…12 U.S.C. 1831d…: (1) [a]ll the interest and finance charges and other fees and charges authorized under division (A) of this section [, including cash advance fees,] are deemed to be interest and may be charged, collected, and received as interest by a bank."  Ohio's usury statute plainly treats cash advance fees as interest for purposes of claims, like Plaintiffs' claims here, under 12 U.S.C. 1831d.

Moreover, numerous courts interpreting DIDA and NBA have routinely refused to take at face value a bank's name for a finance charge, and have broadly construed "interest" to include many types of credit charges.  *See e.g., Watson v. First Union Nat'l Bank*, 837 F.Supp. 146, 150 (D.S.C. 1993) (overlimit fees are interest)*; Nelson v. Citibank (South Dakota), N.A.,* 794 F.Supp. 312 (D.Minn.1992) (late fees and overlimit charges are interest and stating that "courts have uniformly taken an expansive view of 'interest,'" including "numerous charges other than periodic interest rates."); *Greenwood Trust Co. v. Massachusetts*, 971 F.2d 818, 829–30 (1st

Cir.1992) (accepting the view that "the term 'interest' . . . encompass[es] a variety of lender-imposed fees and financial requirements which are independent of a numerical percentage rate"), cert. denied, 506 U.S. 1052, 113 S.Ct. 974, 122 L.Ed.2d 129 (1993).

Fifth Third says repeatedly that the Early Access charge is 10% of the amount borrowed, and "advance" is just another word for an extension of credit.  Fifth Third cannot escape Ohio usury limits by merely calling "interest" by another name.

In the alternative, if Fifth Third argues that the interest charged for each Early Access loan *complies* with O.R.C. § 1109.20—thereby exempting the charges from the 25% APR limitation—it ignores the critical portion of the statute.  A bank and borrower **must agree** to any interest rate charged that exceeds an APR of 25%.  In so doing, Fifth Third also ignores the allegations at issue in this case—that Plaintiffs never agreed to pay any interest rate with an APR exceeding 120%.

O.R.C. § 1109.20(A) states that "a bank may charge, collect, and receive, interest, other fees and charges that are *agreed upon by the bank and the borrower,* including, but not limited to…cash advance fees[32]…" (emphasis added).  "Any fees and charges collected, or received by the bank in accordance with [O.R.C. § 1109.20(A)] shall not be included in computation of the annual percentage rate or the rates of interest or finance charges for purposes of applying the twenty-five percent limitation."  The clear and unambiguous language of O.R.C. § 1109.20(A) requires that the borrower agree to any interest rate charged by a bank in order for those charges to be exempt from the 25% limitation calculation.  Plaintiffs did not so agree.  The CAC includes multiple examples of Early Access loans taken by Plaintiffs that carried an interest rate with and APR higher than 120% in direct contradiction to what was disclosed to Plaintiffs in the

---

[32] O.R.C. § 1109.20(B)(1) deems cash advance fees to be interest for purposes of O.R.C. § 1109.20(A).

44

Contract.[33]  Fifth Third never disclosed the fact a higher interest rate would be charged if a customer's direct deposit occurred less than thirty (30) days from taking the loan.  For purposes of analyzing O.R.C. § 1109.20, the customers could never have agreed to the higher interest rate being charged because it was never disclosed to them by Fifth Third.

O.R.C. § 1109.20 does not provide a free pass for banks to charge any interest rate beyond the 25% limitation so long as it can be characterized as a cash advance fee.  The need for an agreement between the bank and the borrower as to the interest rate being charged is essential to the application of the cash advance exception.  There was no agreement here to charge and APR higher than 120%.  Therefore, Defendant is subject to the 25% limitation outlined in the statute or, in the alternative, is subject to penalties for any rate of interest charged beyond the 120% APR disclosed to the bank's customers.

**IV.    CONCLUSION**

For all these reasons, Fifth Third's Motion to Dismiss the Complaint (Doc. 72) should be denied.

**Dated:  January 21, 2014**           s/ Stuart Scott
                                       STUART E. SCOTT  (0064834)
                                       DANIEL FRECH  (0082737)
                                       **SPANGENBERG SHIBLEY & LIBER LLP**
                                       1001 Lakeside Avenue East, Suite 1700
                                       Cleveland, OH  44114
                                       (216) 696-3232
                                       (216) 696-3924 (FAX)
                                       *sscott@spanglaw.com*
                                       *dfrech@spanglaw.com*

---

[33] CAC at ¶¶ 56, 62, 72, 78, 84 and 90.

HASSAN A. ZAVAREEI  (DC 456161)
JEFFREY KALIEL  (CA 238293)
**TYCKO & ZAVAREEI LLP**
2000 L Street, NW, Suite 808
Washington, DC  20036
(202) 973-0900
(202) 973-095 (FAX)
*hzavareei@tzlegal.com*
*jkaliel@tzlegal.com*

JASON WHITTEMORE
**WAGNER VAUGHAN MCLAUGHLIN**
601 Bayshore Boulevard, Suite 910
Tampa, FL  33606
(800) 360-6439
(813) 225-4010 (FAX)
*jason@wagnerlaw.com*

***Plaintiffs' Interim Class Counsel***

BEN BARNOW
**BARNOW AND ASSOCIATES, P.C.**
One North LaSalle Street, Suite 4600
Chicago, IL  60602
(312) 621-2000
(312) 641-5504 (FAX)
*b.barnow@barnowlaw.com*

PENNY UNKRAUT HENDY
RONALD E. JOHNSON, JR.
**SCHACHTER & HENDY P.S.C.**
909 Wright's Summit Parkway, Suite 210
Fort Wright, KY  41011
(859) 578-4444
(859) 578-4440 (FAX)
*phendy@pschachter.com*
*rjohnson@pschachter.com*

46

STEVEN A. OWINGS
ALEXANDER P. OWINGS
**OWINGS LAW FIRM**
1400 Brookwood Drive
Little Rock, AR  72202
(501) 661-9999
(505) 661-8393 (FAX)
*sowings@owingslawfirm.com*
*aowings@owingslawfirm.com*

T. BRENT WALKER
**CARTER WALKER, PLLC**
2171 West Main, Suite 200
P.O. Box 628
Cabot, AR  72023
(501) 605-1346
*bwalker@walkerlawplc.com*

TIFFANY M. YIATRAS
FRANCIS "CASEY" J. FLYNN, JR.
COREY D. SULLIVAN
**CAREY, DANIS & LOWE**
8235 Forsyth Boulevard, Suite 1100
St. Louis, MO  63105
(314) 725-7700
(314) 721-0905 (FAX)
*tyiatras@careydanis.com*
*casey@jefflowepc.com*
*csullivan@careydanis.com*

JASPER D. WARD
ALEX C. DAVIS
RANDY RATLIFF
**JONES WARD PLC**
312 S. Fourth Street, 6th Floor
Louisville, KY  40202
(502) 882-6000
(502) 587-2007 (FAX)
*jasper@jonesward.com*
*alex@jonesward.com*
*randy@jonesward.com*

***Other Plaintiffs' Counsel***

47

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on this 21st day of January 2014, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF System.  Copies will be served upon counsel of record by, and may be obtained through, the Court CM/ECF Systems.

<div style="margin-left:40%">

s/ Stuart Scott
STUART E. SCOTT  (0064834)
DANIEL FRECH  (0082737)
**SPANGENBERG SHIBLEY & LIBER LLP**
1001 Lakeside Avenue East, Suite 1700
Cleveland, OH  44114
(216) 696-3232
(216) 696-3924 (FAX)
*sscott@spanglaw.com*
*dfrech@spanglaw.com*

***Counsel for Plaintiffs and the Proposed Class***

</div>

48