UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

William R. Klopfenstein, *et al.*,

   Plaintiffs,

  v.

Fifth Third Bank,

   Defendant.

Case No. 1:12cv851

Judge Michael R. Barrett

## OPINION & ORDER

This matter is before the Court upon Defendant Fifth Third Bank's Motion to Dismiss. (Doc. 72). Plaintiffs filed an Opposition (Doc. 79) and Defendant filed a Reply (Doc. 82). After briefing was complete, Defendant filed a Notice of Supplemental Authority. (Doc. 85). Plaintiff also filed a Notice of Supplemental Authorities (Doc. 86), to which Defendant filed a Response (Doc. 87).

### I. BACKGROUND

Plaintiffs' claims are based on their participation in Defendant's Early Access cash advance program. The Early Access program allows customers to get a cash advance on their next direct deposit. The Early Access program was offered to Defendant's customers in Ohio, Kentucky, Michigan, Illinois, Indiana, Tennessee, Missouri and Florida. (Doc. 68, ¶ 26). The program is governed by the "Terms & Conditions." (Doc. 68-1).

Under the Terms & Conditions, "[a]dvances are automatically repaid from your next direct deposit of $100 or more." (Doc. 68-1, PAGEID # 777). If the advance is not

repaid within thirty-five days, Defendant will automatically deduct the outstanding balance from the funds in the checking account. (Id.) A customer "may make a manual payment" to the outstanding balance, but making a manual payment will not decrease the cost of the transaction fees for the advances made. (Id., PAGEID # 778). Both the Terms & Conditions and the monthly statements sent to customers state that the "Annual Percentage Rate" is 120%. (Doc. 68-1, PAGEID # 777; Doc. 68-2, PAGEID # 799). The information regarding the Annual Percentage Rate and Transaction Fees appears as follows in the Terms & Conditions:

**INTEREST RATE AND FEES**

**Interest Rate**

| | |
|---|---|
| Annual Percentage Rate (APR) for Cash Advances | 120% |

**Fees**

| | |
|---|---|
| Annual Fee | None |
| Transaction Fees<br>• Cash Advance | 10% of the amount of each cash Advance |
| Penalty Fees<br>• Late Payment<br>• Over-the-Credit Limit | None<br>None |

**Billing Rights:** Information on your rights to dispute transactions and how to exercise those rights is provided on page 5 of this Agreement.

**Transaction (Cash Advance) Fee:** A 10% transaction fee will be assessed for each dollar that you Advance through your Fifth Third Early Access account feature. For example, for every $10 that you Advance, the transaction fee will be $1; without regard to how long the Advance remains outstanding. This transaction fee will be reflected as an **Annual Percentage Rate (APR)** in the Fifth Third Early Access section of your checking account statement. The APR is a measure of the cost of credit, expressed as a yearly rate. The **Annual Percentage Rate** is calculated by dividing the transaction fee by the Advance amount and multiplying the quotient by the number of statement cycles within a year. For example, $100 Advance with a $10 transaction fee = $10/$100 = 0.1% X 12 cycles = **120% APR.**

(Doc. 68-1, PAGEID # 777).

Plaintiffs point out that the APR will only be 120% for advances which are repaid in thirty days. Plaintiffs explain that they were charged interest rates in excess of 120%

2

even though they received bank statements which stated that their APR was 120%. (Doc. 68, ¶¶ 56, 62, 66, 72, 78, 84, 90). For instance, Plaintiff McKinney alleges that he received a $400 advance in September of 2009 which "resulted in an APR of 1,825%" because the advance was only outstanding for two days. (Doc. 68, ¶ 90(b)).

Plaintiffs bring claims for (1) violations of the Truth in Lending Act; (2) violations of the Electronic Funds Transfer Act; (3) violation of 12 U.S.C. § 1831(d); (4) breach of contract; (5) conversion; (6) unjust enrichment under Ohio law; (7) unjust enrichment under Illinois law; (8) unjust enrichment under Tennessee law; (9) unjust enrichment under Kentucky law; (10) unjust enrichment under Florida law; (11) unjust enrichment under Michigan law; (12) unjust enrichment under Indiana law; (13) fraud under Ohio law; (14) fraud under Tennessee law; (15) fraud under Florida law; (16) fraud under Indiana law; (17) violation of Illinois' Consumer Fraud and Deceptive Business Practice Act; and (18) violation of Kentucky's Consumer Protection Act.

II. **ANALYSIS**

    A. **Motion to Dismiss Standard**

When reviewing a Rule 12(b)(6) motion to dismiss for failure to state a claim, this Court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Bassett v. National Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (quoting *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007)). "[T]o survive a motion to dismiss, a complaint must contain (1) 'enough facts to state a claim to relief that is plausible,' (2) more than 'a formulaic recitation of a cause of action's elements,' and (3) allegations that suggest a 'right to relief above a speculative level.'" *Tackett v. M&G Polymers,*

*USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)). A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009).

### B. Truth in Lending Act

The purpose of the Truth in Lending Act, 15 U.S.C. § 1601, *et seq.*, ("TILA") is "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." *Beach v. Ocwen Fed. Bank*, 523 U.S. 410, 412, (1998) (quoting 15 U.S.C. § 1601(a)). To that end, TILA "requires creditors to provide borrowers with clear and accurate disclosures of terms dealing with things like finance charges, annual percentage rates of interest, and the borrower's rights." *Id.* The Sixth Circuit has stated repeatedly that "TILA is a remedial statute and should be given 'a broad, liberal construction in favor of the consumer.'" *Marais v. Chase Home Fin. LLC*, 736 F.3d 711, 714 (6th Cir. 2013) (quoting *Clemmer v. Key Bank Nat'l Ass'n*, 539 F.3d 349, 353 (6th Cir. 2008); *Begala v. PNC Bank, Ohio N.A.*, 163 F.3d 948, 950 (6th Cir. 1998)).

Defendant argues that TILA and the related provisions of Regulation Z did not require it to disclose an APR for each individual advance because the Early Access program was an open-end credit plan. TILA defines an open-end credit plan as "a plan under which the creditor reasonably contemplates repeated transactions, which prescribes the terms of such transactions, and which provides for a finance charge

4

which may be computed from time to time on the outstanding unpaid balance." 15 U.S.C. § 1602(j).

Like another district court faced with a similar credit plan, called "FastLoan,"[1] this Court finds it unnecessary to determine whether the Early Access program was an open-ended or close-ended program:

> The parties argue extensively about whether FastLoan is an open-ended or close-ended credit plan. *Compare* 12 C.F.R. § 226.5 (disclosures required in open-ended credit transactions) with 12 C.F.R. §§ 226.17–226.18 (disclosures required in close-ended credit transactions). However, I find and conclude that in this instance, the characterization of the plan is ultimately irrelevant. Regardless whether a credit plan is open-ended or close-ended, TILA provides with respect to both set of transactions that "[i]f any information necessary for an accurate disclosure is unknown to the creditor, the creditor shall make the disclosure based on the best information reasonably available at the time the disclosure is provided to the consumer, and shall state clearly that the disclosure is an estimate." 12 C.F.R. §§ 1026.5(c) (applicable to open-ended credit

---

[1] The Terms and Conditions for the "FastLoan" program provided:

**Interest Rate and Finance Charges**

The finance charge is $1 for every $10 borrowed. This equates to an Annual Percentage Rate (APR) of 120%. The actual Annual Percentage Rate (APR) may increase if repayment is made sooner than 30 days. The finance charge will remain constant and will not increase based on the number of days any single advance is outstanding.

**Cash Advance**

A 10% finance charge will be assessed for each dollar that you advance through your FastLoan account feature. This finance charge will be assessed regardless of the length of time in which the advance remains outstanding. For example, if you were to Advance $100, you would be charged $10 as a finance charge whether that Advance is repaid in 1 day or in 35 days. This finance charge will be reflected as an Annual Percentage Rate ("APR") in the FastLoan section of your Associated Checking Account statement. The APR is a measure of the cost of credit, expressed as a yearly rate. The Annual Percentage Rate is calculated by dividing the finance charge by the Advance amount and multiplying the quotient by the number of statement cycles within a year. For example, a $100 Advance with a $10 fee = $10/$100 = 10% X 12 cycles = 120% APR

*Small v. BOKF, N.A.*, No. 13-CV-01125-REB-MJW, 2014 WL 3906257, at *2 (D. Colo. Aug. 7, 2014).

transactions) & 1026.17(c)(2)(i) (applicable to close-ended credit transactions).

*Small v. BOKF, N.A.*, No. 13-CV-01125-REB-MJW, 2014 WL 3906257, at *3 (D. Colo. Aug. 7, 2014). The court found that the plaintiff was entitled summary judgment because even though the defendant could not know the exact APR at the time the advance was made, there was evidence that the defendant knew that the majority of advances would be repaid within ten to fourteen days. *Id.* at *3. Therefore, the court concluded that "defendant's reliance on a thirty-day term to express the APR was misleading and constituted a failure to provide the best information available to help consumers compare the costs associated with the FastLoan program to other available products." *Id.* The court also noted that the 120% APR included on the monthly bank statements was plainly inaccurate:

> At the time the statements were issued, defendant knew the actual length of time between origination and repayment of each particular FastLoan advance. It therefore was inaccurate and misleading for defendant to rely on its thirty-day repayment assumption when it had all the information necessary to make an accurate disclosure.

*Id.* at *4. Finally, the court noted that "[a]lthough defendant insists that the actual APR was readily discoverable from the formula it disclosed, I cannot find that the average consumer would readily understand how to make the mathematical calculations necessary to derive an accurate representation of the APR for an advance repaid sooner than 30 days." *Id.*

At this stage of the litigation, this Court finds little to distinguish Plaintiffs' TILA claim from the one described in *Small v. BOKF*. Therefore, Defendant's Motion to Dismiss is DENIED as to Plaintiffs' claim under the Truth in Lending Act (Count One).

### C. Electronic Funds Transfer Act

6

Plaintiffs claim that Defendant violated Section 913(1) of the Electronic Funds Transfer Act ("EFTA"), which prohibits "condition[ing] the extension of credit to a consumer on such consumer's repayment by means of preauthorized electronic fund transfers." 15 U.S.C. § 1693k(1). Under the EFTA, the term "preauthorized electronic fund transfer" means "an electronic fund transfer authorized in advance to recur at substantially regular intervals." 15 U.S.C. § 1693a(10).

Defendant argues that Section 913(1) does not apply because the Early Access program does not require an electronic fund transfer that "recurs at substantially regular intervals" without any "further action" by the consumer.

As one district court has noted, the provisions related to "preauthorized electronic fund transfers" were aimed to protect "consumers who arrange for regular payments (such as insurance premiums or utility bills) to be deducted automatically from their bank accounts." *Okocha v. HSBC Bank USA, N.A.*, No. 08 Civ. 8650 (MHP), 2010 WL 5122614, at *2 (S.D.N.Y. Dec. 14, 2010) (citing S. Rep. 95–915 (1978)).

In *Small v. BOKF*, discussed above, the district court found that the repayments which were a part of the FastLoan program were not designed to recur at "substantially regular intervals." 2014 WL 3906257, at *4. The court noted that even though the majority of direct deposits came from borrowers' bi-weekly paychecks or monthly benefits payments, those withdraws were limited in number and duration because each FastLoan advance had to be repaid within thirty-five days. *Id.* at *5. The court explained:

> Even if a borrower's account could have been debited multiple times–a proposition for which there is no factual support in the record before me– there is no evidence that such deductions were to occur of necessity on any regularly scheduled basis. *See Puglisi v. Debt Recovery Solutions*,

7

>LLC, 822 F. Supp. 2d 218, 232 (E.D. N.Y. 2011) (authorization for two withdrawals to pay debt did not satisfy this condition to liability under the EFTA); *Okocha*, 2010 WL 5122614 at *2 (rejecting EFTA claim were evidence showed only that plaintiff had authorized multiple transfers, but not that such transfers were to occur "at weekly, monthly, or annual intervals").

*Id.* (footnote omitted).

Similarly, the Terms & Conditions of the Early Access program do not provide for any electronic fund transfers to be made at "substantially regular intervals." There is no provision that the repayment for an advance will be made daily, weekly or monthly. Moreover, during the thirty-five day repayment period, only direct deposits in the amount of $100 or more are eligible to be used as repayment. As a result, the Court finds that Section 913(1) of the EFTA is not applicable to the Early Access program.

Therefore, Defendant's Motion to Dismiss is GRANTED as to Plaintiffs' claim under the Electronic Funds Transfer Act (Count Two).

### D. <u>12 U.S.C. § 1831d</u>

Plaintiffs' usury claim under 12 U.S.C. § 1831d is based on violations of Ohio Revised Code § 1109.20. Defendant argues that the "most favored lender doctrine" bars Plaintiffs' claim, and if the claim is not barred, Ohio Revised Code § 1109.20 expressly allows cash advance fees.

Under Section 27 of the Federal Deposit Insurance Act ("FDIA"), a state-chartered, federally insured bank is authorized to impose finance charges and late fees under the governance of the usury laws of the state where the bank is located. 12 U.S.C. § 1831d.[2] As such, the FDIA allows a state-chartered bank to charge interest

---

[2] Section 27 of the FDIA was drafted as Section 521 in Title V of the Depository Institutions Deregulation and Monetary Control Act of 1980 ("DIDA"), Pub.L. No. 96–221, § 521,

8

rates permitted in its home state on loans made outside of that state, even if that interest rate would be illegal in the state where the loan is made.³

Defendant argues that under the most favored lender doctrine, it may charge its customers the most favorable rates available in Ohio. Defendant relies on the Sixth Circuit's decision in *Begala v. PNC Bank, Ohio, N.A.*, 214 F.3d 776 (6th Cir. 2000), which was an interpretation of Section 85 of the National Bank Act ("NBA"), and not the FDIA. However, as one district court has explained:

> Sections 85 and 86 of the National Bank Act and § 1831d of the Depository Institution Deregulation and Monetary Control Act ["DIDA"] are virtually identical. The former applies to national banks while the latter applies to state-chartered federally-insured banks." *Beaumont v. Fortis Benefits Ins. Co.*, No. 07–CV–050–GKF–FHM, 2008 WL 906186, at *3, 2008 U.S. Dist. LEXIS 27321, at *7 n. 3 (N.D.Okla. Mar. 29, 2008).

*Sawyer v. Bill Me Later, Inc.*, No. 2:11-CV-00988, 2014 WL 2159044 (D. Utah May 23, 2014). Because the relevant language in the FDIA and the NBA is virtually identical, this Court finds the Sixth Circuit's interpretation of the NBA in *Begala* applicable to the

---

94 Stat. 132 (1980) (codified at 12 U.S.C. § 1831d). This section is referred to interchangeably as the FDIA, DIDA or DIDMCA.

³One district court has explained the history of the FDIA as follows:

> Prior to the enactment of DIDA in 1980, regulation of interest rates charged by state banks was solely a matter of state law. In contrast, federal law has governed the interest rates chargeable by national banks since the enactment of the National Bank Act in 1864. Under federal law, national banks are afforded "most favored lender" status, meaning a national bank may charge the highest rates allowed to any competing institution in the state in which it is located. In addition, national banks may "export" a favorable interest rate from its home state in transactions with borrowers from other states. *Marquette National Bank v. First Omaha Service Corp.*, 439 U.S. 299, 99 S.Ct. 540, 58 L.Ed.2d 534 (1978). In 1979 and 1980, a period of extremely high interest rates, national banks enjoyed a competitive advantage over state banks which were bound by lower state usury ceilings. As the language and legislative history of § 521 make clear, Congress enacted § 521 to create parity between national and state banks with respect to usury limitations.

*Hill v. Chem. Bank*, 799 F. Supp. 948, 951 (D. Minn. 1992).

9

interpretation of the FDIA.

In *Begala v. PNC Bank, Ohio, N.A.*, the Sixth Circuit found that Section 85 of the NBA allowed a nationally chartered bank to charge the rate allowed to the "most favored lenders" under state law. As the Sixth Circuit explained:

> Therefore, the question becomes one of Ohio state banking law, and the maximum interest rate allowed to banks under Ohio law determines whether PNC has charged excessive interest in this case. *See Kenty v. Bank One, Columbus, N.A.*, 92 F.3d 384, 393 (6th Cir. 1996).
>
> Ohio law allows "building and loan associations" as well as "savings banks" to charge unlimited dues, fines, interest and premiums on loans made. *See* Ohio Rev. Code Ann. §§ 1151.21, 1161.28 (Anderson 1996). Therefore, under the Most Favored Lender doctrine, PNC may also charge unlimited interest on its loans made.

214 F.3d at 782.

Plaintiffs do not necessarily dispute the applicability of the most favored lender doctrine, but they do dispute that the application of this doctrine allows Defendant to charge unlimited interest on any loan. Plaintiffs argue that Defendant may only charge unlimited interest on loans which are within the same class or type of loan.

The United States Supreme Court noted that the "most favored lender" status for national banks has been incorporated into the regulations of the Comptroller of the Currency. *Marquette Nat. Bank of Minneapolis v. First of Omaha Serv. Corp.*, 439 U.S. 299, 314, n.26 (1978). These regulations provide:

> A national bank located in a state may charge interest at the maximum rate permitted to any state-chartered or licensed lending institution by the law of that state. If state law permits different interest charges on specified classes of loans, a national bank making such loans is subject only to the provisions of state law relating to that class of loans that are material to the determination of the permitted interest. For example, a national bank may lawfully charge the highest rate permitted to be charged by a state-licensed small loan company, without being so licensed, but subject to state law limitations on the size of loans made by

10

small loan companies.

12 C.F.R. § 7.4001.[4] As one federal circuit court has explained, the term "class of loan" can be read broadly:

> It is quite true that lenders licensed in Nebraska under the provisions of R.S.Neb. ss 45-114 *et seq.* are not engaged in competition with banks in the over-all business of banking and that the loans made by them do not involve credit card transactions. That, however, is not of controlling importance. While a licensed maker of small loans in Nebraska and a state or national bank in Nebraska are lenders of different types, and while small loans companies doubtless make loans that banks would not make, there is really no essential difference between the type of consumer loan that is made by a small loan company and the type of consumer loan that is made by the defendant bank on the basis of a credit card transaction. Whether the loan is made by a small loan company or whether it is made by a bank, it is a consumer loan which may be repaid in installments. In other words, if a person desires to buy merchandise worth $100.00 on installment credit, it makes no practical difference whether he gets the money from a small loan company and pays cash for the merchandise or whether he obtains the merchandise in the first instance by using a credit card and ultimately discharges the obligation by installment payments to the bank.

*Fisher v. First Nat. Bank of Omaha*, 548 F.2d 255, 260 (8th Cir. 1977).

Defendant points out that in Ohio, savings and loan banks may issue loans similar to Early Access loans: "An association may make, originate, purchase, sell, service, and participate in direct or indirect consumer loans." Ohio Rev. Code § 1151.298(A); *see also* Ohio Rev. Code § 1161.43(A) (applicable to savings banks). The statute defines "consumer loan" as "a secured or unsecured loan to a natural person for personal, family, or household purposes." *Id.*

Moreover, the Court notes that Ohio Revised Code § 1109.20(A) specifically excludes "cash advance fees" from the statute's annual percentage rate calculation: "Any fees and charges charged, collected, or received by a bank in accordance with this

---

[4] The former version of this regulation was found at 12 C.F.R. § 7.7310.

division shall not be included in the computation of the annual percentage rate or the rates of interest or finance charges for purposes of applying the twenty-five per cent limitation." As one court has explained:

> The determination of the maximum amount of interest which may be charged for the use of money loaned has always been within the police power of the state, and the details of and exceptions to the legislation have rested within the discretion of the state legislature. *See Griffith v. Connecticut*, 218 U.S. 563, 568-69, 31 S.Ct. 132, 133, 54 L.Ed. 1151 (1910). In § 85 of the Bank Act, Congress expressly and unambiguously stated that a national bank was subject to the interest provision of the laws of the state in which the bank was located. Accordingly, Congress may look to the laws of the states to define the term "interest," as well as to set the allowable rate of interest. *See Tikkanen v. Citibank (South Dakota) N.A.*, 801 F.Supp. 270, 278 (D.Minn. 1992).

*Video Trax, Inc. v. NationsBank, N.A.*, 33 F. Supp. 2d 1041, 1050 (S.D. Fla. 1998) *aff'd*, 205 F.3d 1358 (11th Cir. 2000). Therefore, the transaction fee of $1 for every $10 advanced does not constitute interest under Ohio Revised Code § 1109.20(A). Accordingly, Plaintiffs have not stated a claim under 12 U.S.C. § 1831(d) (Count Three).

### E. Breach of Contract

The parties agree that Ohio law governs Plaintiffs' breach of contract claim. "Under Ohio law, contract interpretation is a matter of law when a contract's terms are clear and unambiguous." *Pavlovich v. Nat'l City Bank*, 435 F.3d 560, 565 (6th Cir. 2006) (citing *Long Beach Ass'n, Inc. v. Jones*, 697 N.E.2d 208, 209-10 (Ohio 1998)). In interpreting a contract, a court gives effect to every phrase and takes into account "the subject matter, nature and purpose of the agreement." *Gencorp, Inc. v. American Int'l Underwriters*, 178 F.3d 804, 818 (6th Cir. 1999).

Plaintiffs allege that Defendant breached the parties' contract by charging APRs in excess of 120%. Specifically, Plaintiffs claim that the fee of $1 for every $10

advanced often equates to an APR that is higher than the 120% disclosed in the Terms & Conditions.

The Terms & Conditions states the transaction fee that plaintiffs were charged: 10% for each dollar advanced. The Terms & Conditions also explains the APR "is calculated by dividing the transaction fee by the Advance amount and multiplying the quotient by the number of statement cycles within a year. For example, $100 Advance with a $10 transaction fee = $10/$100 = .1% x 12 cycles = 120% APR." While the 120% APR may be misleading because not every transaction is paid in twelve cycles, the Terms & Conditions are unambiguous in their explanation as to the method for calculating the APR. Because Plaintiffs do not dispute that they were charged a 10% transaction fee without any regard to how long the advance remained outstanding, there was no breach of the Terms & Conditions. Therefore, Plaintiffs' claims for breach of contract (Count Four) is DISMISSED.

### F. Conversion

Defendant argues that Plaintiffs' claim for conversion fails for three reasons: (1) a contract governs the issue, (2) Defendant complied with the contract, and (3) conversion claims do not exist for fungible money.

As the Sixth Circuit has explained, under Ohio law:

> To prevail on a conversion claim, a plaintiff must establish "(1) plaintiff's ownership or right to possession of the property at the time of conversion; (2) defendant's conversion by a wrongful act or disposition of plaintiff's property rights; and (3) damages." *Dream Makers v. Marshek*, 2002-Ohio-7069, ¶ 19, 2002 WL 31839190 (Ohio Ct. App. Dec. 19, 2002) (citation omitted). As in all tort actions that are "factually intertwined" with a contract, "[i]n conversion actions, Ohio Courts have held, '[s]uch tort claim lies against a contracting party independent of a breach of contract claim so long as the plaintiff alleges a breach of a duty owed separately from obligations created by the contract.'" *Jean v. Stanley Works*, No. 1:04-CV-

1904, 2006 WL 1966644, at *5, 2006 U.S. Dist. LEXIS 50027, at *14 (N.D. Ohio July 5, 2006) (quoting *DeNune v. Consol. Capital of N. Am., Inc.*, 288 F.Supp.2d 844, 854 (N.D. Ohio 2003)).

*Academic Imaging, LLC v. Soterion Corp.*, 352 F. App'x 59, 67 (6th Cir. 2009). Here, Plaintiffs have not identified any breach of duty separate from the obligations created by the Terms & Conditions. Therefore, Plaintiffs' claim for conversion (Count Five) is DISMISSED.

### G. Unjust enrichment

Plaintiffs have brought claims for unjust enrichment under Ohio, Illinois, Tennessee, Kentucky, Florida, Michigan and Indiana law.

The Terms & Conditions includes a choice-of-law provision which states that Ohio law governs issues related to the Early Access program: "You understand that we are a state-chartered bank located in Ohio. The law that will apply to this Agreement as to issues related to interest and related charges will be the law of the State of Ohio." (Doc. 68-1, PAGEID #780). Plaintiffs do not dispute the validity or enforceability of this provision.

The Court finds the choice-of-law provision applicable because Plaintiffs' claim is based on "interest and related charges." Therefore, Plaintiffs' claims for unjust enrichment under Illinois, Tennessee, Kentucky, Florida, Michigan and Indiana law (Counts 7 through 12) are DISMISSED.

The Sixth Circuit has explained that under Ohio law "[u]njust enrichment is an equitable doctrine to justify a quasi-contractual remedy that operates *in the absence of an express contract or a contract implied in fact* to prevent a party from retaining money or benefits that in justice and equity belong to another." *Wuliger v. Manufacturers Life*

*Ins. Co.*, 567 F.3d 787, 799 (6th Cir. 2009) (quoting *Beatley v. Beatley*, 828 N.E.2d 180, 192-93 (2005) (quotations and citations omitted) (emphasis added). Therefore, "Ohio law is clear that a plaintiff may not recover under the theory of unjust enrichment or quasi-contract when an express contract covers the same subject." *Id*. (quoting *Lehmkuhl v. ECR Corp.*, No. 06 CA 039, 2008 WL 5104747, at *5 (2008)). Plaintiffs do not dispute that the Terms & Conditions cover the same subject as their unjust enrichment claim. Therefore, Plaintiffs' claim for unjust enrichment under Ohio law (Count Six) is DISMISSED.

### H. Fraud

Because the choice-of-law provision found in the Terms & Conditions includes a choice-of-law provision which states that Ohio law governs, Plaintiffs' claim for fraud under Tennessee, Florida and Indiana law (Counts 14 through 16) are DISMISSED.

Defendant argues that under Ohio law, Plaintiffs cannot bring a tort claim based on a contract. Plaintiffs respond that the Terms & Conditions are both an agreement and a prior disclosure, and clarify that their claim is for fraud in the inducement.

"To prevail on a claim of fraud in the inducement, a plaintiff must prove: 1) a representation; 2) material to the transaction; 3) made falsely, with knowledge of its falsity; 4) with the intent of misleading another into relying upon the false statement; 5) justifiable reliance on the representation; and 6) resulting injury proximately caused by such reliance." *Onyx Envtl. Servs., LLC v. Maison*, 407 F. Supp. 2d 874, 878 (N.D. Ohio 2005) (citing *Burr v. Bd. of County Comm'r of Stark County*, 23 Ohio St.3d 69, 491 N.E.2d 1101 (1986)).

Defendant argues that even if Plaintiffs' fraud claim can be considered apart from

their contract claim, that claim fails because the 120% APR disclosure in the Terms & Conditions was not false, and Plaintiffs could not have justifiably relied on their incorrect reading of the contract. The Court agrees. As the Terms & Conditions themselves explain, if the APR is "a measure of the cost of credit, expressed as a yearly rate." As the Terms & Conditions also explain, when the APR is calculated using twelve statement cycles, the APR will be 120%. While the 120% APR figure may be misleading, there is nothing false about how it was calculated. Therefore, Plaintiffs' claim for fraud under Ohio law (Count 13) is DISMISSED.

### I. Illinois and Kentucky statutory claims

Plaintiffs bring claims for violations of the Illinois Consumer Fraud Act and Deceptive Business Practice Act and the Kentucky Consumer Protection Act. Defendant argues that Plaintiffs' consumer-protection law claims fail because plaintiffs were charged appropriately pursuant to the contract, and because the choice-of-law provision bars these claims.

The Court finds the choice-of-law provision bars Plaintiffs' claims under Illinois and Kentucky law. Therefore, Plaintiffs' claims under Illinois' Consumer Fraud and Deceptive Business Practice Act (Count 17) and Kentucky's Consumer Protection Act (Count 18) are DISMISSED.

### III. CONCLUSION

Based on the foregoing, Defendant Fifth Third Bank's Motion to Dismiss (Doc. 72) is **GRANTED in PART and DENIED in PART**. Plaintiffs' claims are **DISMISSED with PREJUDICE** except for Plaintiffs' claim under the Truth in Lending Act (Count

One) which shall remain pending before this Court.

    **IT IS SO ORDERED.**

                                                   */s/ Michael R. Barrett*
                                             JUDGE MICHAEL R. BARRETT